## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## NEW HAVEN DIVISION

| | | |
|---|---|---|
| In re: | : | |
| SERVICOM, LLC, | : | Case No. 18-31722 (AMN) |
| JNET COMMUNICATIONS, LLC, | : | Case No. 18-31723 (AMN) |
| VITEL COMMUNICATIONS, LLC, | : | Case No. 18-31724 (AMN) |
| *Debtors* | : | Jointly Administered Under |
| | : | Case No. 18-31722 (AMN) |

| | | |
|---|---|---|
| | : | |
| VFI KR SPE I, LLC, | : | Adv. Pro. No. 19-3005 (AMN) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| EUGENE CALDWELL, | : | |
| DAVID JEFFERSON, and CORAL | : | |
| CAPITAL SOLUTIONS, LLC, | : | |
| *Defendants* | : | Re:  AP-ECF No. 87, 104 |

| | | |
|---|---|---|
| | : | |
| BARBARA H. KATZ, | : | Adv. Pro. No. 19-3006 |
| CHAPTER 7 TRUSTEE, | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| EUGENE CALDWELL, | : | |
| DAVID JEFFERSON, and CORAL | : | |
| CAPITAL SOLUTIONS, LLC, | : | |
| *Defendants* | : | Re: AP-ECF No. 74, 92 |

**MEMORANDUM OF DECISION AND ORDER GRANTING IN PART,
AND DENYING IN PART, DEFENDANTS' MOTION FOR JUDGMENT
PURSUANT TO FED.R.BANKR.P. 7012 AND FED.R.CIV.P. 12(c), AND,
<u>ORDER GRANTING LEAVE TO FILE AMENDED COMPLAINTS</u>**

*APPEARANCES IN CASE NO. 19-3005*

Jay L. Welford, Esq.                          *Counsel for Plaintiff*
Jaffe Raitt Heuer & Weiss, P.C.               *VFI KR SPE I, LLC*
27777 Franklin Road, Suite 2500
Southfield, MI 48034

Douglas S. Skalka, Esq.
Neubert, Pepe, and Monteith
195 Church Street, 13th Floor
New Haven, CT 06510

Paul N. Gilmore, Esq.                         *Counsel for Defendants*
Updike, Kelly & Spellacy, P.C.                *David Jefferson and*
100 Pearl Street                              *Eugene Caldwell*
Hartford, CT 06103

Harlan M. Lazarus, Esq.                       *Counsel for Defendant*,
Lazarus and Lazarus, P.C.                     *Coral Capital Solutions, LLC*
240 Madison Avenue, 8th floor
New York, NY 10016

Craig I. Lifland, Esq.
Halloran & Sage
225 Asylum Street
Hartford, CT 06103

*APPEARANCES IN CASE NO. 19-3006*

Robert M. Fleischer, Esq.                     *Counsel for Plaintiff*
Joanna M. Kornafel, Esq.                      *Barbara H. Katz,*
Jeffrey M. Sklarz, Esq.                       *Chapter 7 Trustee*
Green & Sklarz, LLC
One Audubon Street, 3rd Floor
New Haven, CT 06511

Paul N. Gilmore, Esq.                         *Counsel for Defendants*
Updike, Kelly & Spellacy, P.C.                *David Jefferson and*
100 Pearl Street                              *Eugene Caldwell*
Hartford, CT 06103

Harlan M. Lazarus, Esq.                       *Counsel for Defendant*
Lazarus and Lazarus, P.C.                     *Coral Capital Solutions, LLC*
240 Madison Avenue, 8th floor
New York, NY 10016

Craig I. Lifland, Esq.

2

Halloran & Sage
225 Asylum Street
Hartford, CT 06103

## I.    <u>INTRODUCTION</u>

To decide the pending Rule 12(c)[1] motions in these two adversary proceedings, I must determine whether the plaintiffs adequately pleaded legally sufficient marshaling and recharacterization claims.

The plaintiffs are VFI KR SPE I, LLC (in adversary proceeding number 19-3005), a junior secured creditor holding a lien against the assets of one of the three debtors (the "Junior Creditor"), and, Barbara H. Katz, in her capacity as the Chapter 7 Trustee (in adversary proceeding number 19-3006) for three bankruptcy debtors that are being jointly administered, but have not been substantively consolidated (the "Trustee" and together, the "Plaintiffs").

The defendants include Coral Capital Solutions, LLC (the "Senior Creditor"), a senior secured creditor holding a lien against the assets of all three debtors; David Jefferson ("Jefferson"), the founder and former chief executive officer of debtor JNET Communications, LLC ("JNET"); and, Eugene Caldwell ("Caldwell"), formerly the chief financial officer of JNET (together, the "Defendants").

The parties' dispute centers around a collateralized guaranty Jefferson and Caldwell provided to the Senior Creditor to induce it to loan money to JNET in 2017. Essentially, the Trustee and the Junior Creditor want the court to require the Senior Creditor to apply the collateral provided by Jefferson and Caldwell (which was cash) to pay the Senior Creditor's outstanding loan balance, thereby reducing or eliminating a

---

[1]    Fed.R.Civ.P. 12(c), made applicable here through Fed.R.Bankr.P. 7012.

claim against the bankruptcy estates. If this happened, the Junior Creditor and other bankruptcy creditors would benefit. Jefferson and Caldwell naturally oppose this result, and, want the Trustee to pay the Senior Creditor's claim from the estate property she is holding so they may recover the collateral they provided to the Senior Creditor.

Alternatively, the Trustee and Junior Creditor request recharacterization of the collateral Jefferson and Caldwell pledged to the Senior Creditor so it is considered equity or a capital contribution to the now-defunct debtor-companies rather than an independent collateral pledge to a lender. If Plaintiffs succeed in either of these claims, there would be more money to distribute to the remaining creditors of the bankruptcy estates.

Jefferson and Caldwell, joined by the Senior Creditor, now seek judgment pursuant to Rule 12(c), arguing in essence that: (1) the Trustee and the Junior Creditor may not require the marshaling of assets under the circumstances here; and, (2) any recharacterization claim fails to plead required facts. The Defendants argue the complaints fail to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) and (c).

For the reasons that follow, the court concludes the Rule 12(c) motions should be granted in part and denied in part. The Trustee and Junior Creditor may replead and address the deficiencies noted in this Memorandum of Decision.

## II.    <u>JURISDICTION</u>

The United States District Court for the District of Connecticut has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). The Bankruptcy Court, in turn, has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. § 157(a) and the Order of Reference of the District Court dated September 21, 1984. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (O), as relevant to this Memorandum and Decision. This Court has jurisdiction over core proceedings pursuant

4

to 28 U.S.C. §§ 157(b)(1) and 1334, and, may hear and enter a final order in this matter subject to traditional appeal rights.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409 as this proceeding arises under and in connection with a case under the Bankruptcy Code.  Pursuant to Fed.R.Bankr.P. 7012(b), all parties consent to the jurisdiction of the Bankruptcy Court and its authority to enter final orders or judgments. *See*, 19-3005 AP-ECF Nos. 35, 54, 55, 57; 19-3006 AP-ECF Nos. 30, 47, 48, 49. [2]

## III.    <u>RELEVANT PRE-PETITION BACKGROUND</u>

### a.  Scope of the Record

When considering a motion for judgment on the pleadings pursuant to Rule 12(c), a court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor."  *Bryan v. Credit Control, LLC*, 954 F.3d 576, 580 (2d Cir. 2020).  The court is empowered to consider any information cited to it that is present in the complaints, documents attached to the complaints, "or materials of which the Court can take judicial notice, such as the Bankruptcy Court docket."  *Campos v. Aegis Realty Mgt. Corp.*, 19 CIV. 2856 (KPF), 2020 WL 433356, at *7 (S.D.N.Y. Jan. 28, 2020); *See also, Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)("[D]ocket sheets are public records of which the court could take judicial notice."); *In re Howard's Exp., Inc.*, 151 Fed.Appx 46, 48 (2d Cir. 2005)(taking judicial notice of Bankruptcy Court docket); *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)(noting that court may take judicial notice of the actions taken in related proceedings "to establish the fact of such litigation and related filings").  Nothing requires

---

[2]    Citations to the docket in case no. 18-31722 are noted by "18-31722 ECF No." Citations to the docket of the two adversary proceedings, case numbers 19-3005 and 19-3006, are noted as "19-300_ AP-ECF No. ___".

"the Court to review portions of the record in response to a motion, where the moving and opposition papers do not make specific reference to such portions of the record." D.Conn.L.Civ.R. 7(a)(3).

This consolidated Memorandum of Decision notes and relies on facts from each Plaintiff's complaint as well as the record of the underlying bankruptcy cases which remain pending.

   b.  The Debtors

Three limited liability companies registered in Delaware are relevant here including: JNET Communications, LLC ("JNET"), ServiCom, LLC ("ServiCom"), and Vitel Communications ("Vitel" and collectively with JNET and ServiCom, the "Debtors"). Each filed a Chapter 11 bankruptcy petition on the same date, October 19, 2018 (the "Petition Date").[3] Importantly, I note the Trustee's complaint defines the term "ServiCom" to mean all three Debtors, while the Junior Creditor's complaint defines the term "Debtors" to mean all three Debtors, and the terms are used throughout each complaint in an almost generic fashion. 19-3005 AP-ECF No. 1, ¶ 4 (AP-ECF No. 1 is the "Junior Creditor's Complaint"); 19-3006 AP-ECF No. 1, fn. 1 (AP-ECF No. 1 is the "Trustee's Complaint," and together with the Junior Creditor's Complaint, the "Complaints"). As will become apparent, the use of these defined terms to refer to multiple entities resulted in a lack of precision throughout the Complaints.[4]

---

[3]      A fourth related company – ServiCom Canada, LTD ("ServiCom Canada") – filed a voluntary petition a few days later, but its bankruptcy case was closed on April 5, 2019 after the Trustee filed a report of no distribution. 18-31734 ECF Nos. 26-28; 18-31722 ECF No. 591. ServiCom Canada was a limited company organized in Nova Scotia, Canada, and a wholly owned subsidiary of ServiCom. Trustee's Complaint, ¶ 5, Case No. 19-3006. ServiCom Canada is not a party to any of the agreements relevant to this Decision.

[4]      The record of these cases reflects that while they have been jointly administered, they are not substantively consolidated and have distinct pools of creditors. For example, the creditors asserting claims

Before and immediately after the Petition Date, JNET provided overall management and administrative support to ServiCom and Vitel, and, held 100% of their membership interests.  18-31722 ECF Nos. 1, p. 5; 9, p. 3; 108, p. 404; Junior Creditor Complaint, ¶ 5.

Defendant Jefferson was the founder and chief executive officer of JNET. Trustee's Complaint, ¶ 5.  Defendant Caldwell was the chief financial officer of JNET. Junior Creditor's Complaint, ¶¶ 4, 7, 9; Trustee's Complaint, ¶ 5.  On the Petition Date, the membership interests in JNET were held as follows:

| Name | Membership Interest |
|---|---|
| Jefferson, LLC | 50.85% |
| Pacesetter SBIC Fund, LLC ("Pacesetter") | 31.99% |
| Eugene Caldwell | 8.69% |
| Atlas Services Holding, LLC | 7.59% |
| Atlas FRM, LLC | 0.88% |

*See*, 18-31723 ECF No. 21, p. 36, 50; JNET's Statement of Financial Affairs and List of Equity Security Holders, Response to Question 28.

Jefferson, LLC's sole member was Jefferson.  Trustee's Complaint, ¶ 7.  Despite the requirements of JNET's Second Amended and Restated Limited Liability Company Agreement creating a board of managers to manage the company, it "never" held formal board meetings nor passed formal resolutions after 2013, and placed financial control of the entity with Caldwell.  Trustee's Complaint, ¶¶ 10-24.  Despite being JNET's chief executive officer, Jefferson deferred to Caldwell for all financial decisions.  Trustee's Complaint, ¶ 18.

---

against each debtor differ significantly in number and claim amount, as summarized in the following table.

| Bankruptcy Case | Number of Proofs of Claim | Cumulative Total of Filed Proofs of Claim |
|---|---|---|
| 18-31722 ServiCom | 98 | $31,690,789.59 |
| 18-31723 JNET | 30 | $16,911,640.71 |
| 18-31724 Vitel | 43 | $15,173,258.15 |

ServiCom generated revenue by providing call center services primarily to Sirius XM Radio Inc., AT&T Services, Inc., OnStar Corporation, LLC, and Allstate Motor Club, Inc. ServiCom also provided installation services for telecommunications equipment. Trustee's Complaint, ¶ 25. Interestingly, during the Chapter 11 case, JNET sold and assigned its rights to the Sirius XM Radio Inc. and AT&T Services, Inc. contracts, while ServiCom sold and assigned its rights to the OnStar Corporation, LLC and Allstate Motor Club, Inc. contracts. 18-31722 ECF No. 289, Ex. A, §§ 2.1, 2.2. Vitel generated revenue through cable industry construction work or cable system installations. Trustee's Complaint, fn. 4. As of the Petition Date, JNET, ServiCom, and Vitel employed approximately 31, 200, and 25 people, respectively.[5] 18-31722 ECF Nos. 7, p. 4; 9, p. 3; 199, p. 6.

### c. ServiCom's Dire Financial Situation

In the years preceding the Petition Date, ServiCom was in financial distress and unable to pay its debts. Trustee's Complaint, ¶ 48. In 2012, ServiCom was saddled with over $15,000,000 in debt while holding approximately $6,153,532 in assets. Trustee's Complaint, ¶ 45. The amount of debt would have been closer to $22,000,000, but in 2011 ServiCom entered into an agreement with a third-party creditor – Pacesetter – to convert its debt into an equity interest, thereby reducing the overall debt load. Trustee's Complaint, ¶¶ 45-47.

At the end of 2014 and 2015, ServiCom had a few hundred dollars and zero dollars in cash, respectively. Trustee's Complaint, ¶ 55. Any cash on hand at the end of 2016

---

[5] ServiCom Canada served as the largest call center providing services to the clients of ServiCom. As of the Petition Date, ServiCom Canada employed approximately 500 people. 18-31722 ECF No. 199, p. 6. ServiCom Canada was a debtor but is not relevant to this Decision because it is not a party to any of the relevant agreements and its bankruptcy case was closed on April 5, 2019.

8

was the result of a billing error that was subsequently repaid.  Trustee's Complaint, ¶¶ 57-60.  At the end of 2017, ServiCom again had zero dollars in cash.  Trustee's Complaint, ¶¶ 64-65.

### d.  The Creditors

ServiCom and JNET entered into three agreements relevant here that are alleged to have resulted in secured claims asserted by the Senior Creditor and the Junior Creditor.  First, ServiCom and JNET both entered into a factoring agreement with the Senior Creditor (Coral Capital Solutions, LLC), ServiCom (but not JNET) entered into a master lease agreement with the Junior Creditor (VFI KR SPE I, LLC).  And, third, JNET (but not ServiCom) entered into a term note with the Senior Creditor.  The Trustee enjoys the status of a hypothetical lien creditor as to both ServiCom and JNET, subject to any prior liens, pursuant to 11 U.S.C. § 544.

### i.  The Senior Creditor Factoring Agreement

Years before the Petition Date, on October 17, 2011, JNET, ServiCom, and Vitel entered into a Factoring Agreement with the Senior Creditor requiring each of the Debtors to sell and assign certain accounts receivable arising from the Debtors' sale of goods or rendition of services within the United States and Canada (the "Factoring Agreement").  Junior Creditor's Complaint, Ex. A; Trustee's Complaint, Ex. B; 18-31722 ECF No. 279, p. 5.[6]  The Senior Creditor had no obligation to purchase any of the receivables, and, in

---

[6]    The Trustee attached a copy of the Factoring Agreement as Exhibit B to her complaint.  Trustee's Complaint, Ex. B.  Exhibit B is twenty-seven pages in length and does not include any of the amendments to the Factoring Agreement subsequently entered into between JNET, ServiCom, Vitel, and the Senior Creditor.  In comparison, the Junior Creditor attached a copy of the Factoring Agreement as Exhibit A to its complaint.  Junior Creditor's Complaint, p. 19 (filed illegibly in terms of the header numbers starting at p. 19 of the Junior Creditor's Complaint).  The Factoring Agreement attached as Exhibit A included copies of twelve amendments including: a November 7, 2012 Letter Amendment, a March 6, 2013 Letter Amendment, a March 14, 2013 Amendment, a May 15, 2013 Letter Amendment, an April 1, 2014 Amendment, a June 10, 2014 Amendment, an October 27, 2014 Letter Amendment, a September 22, 2015

its sole discretion could choose which customer invoices would become "Approved Receivables." Trustee's Complaint, Ex. B, § 1.3(a). The purchase price for Approved Receivables would be the "Net Amount" (as defined in the Factoring Agreement to mean, generally, the gross face amount of the customer invoice minus any discounts or credits) payable in two installments. Trustee's Complaint, Ex. B, § 2.1. The first payment would be an "Advance," in an amount generally equal to up to 85% of the Net Amount of the Approved Receivables. Trustee's Complaint, Ex. B, § 2.2. After a customer paid an Approved Receivable to the Senior Creditor, the Senior Creditor would credit the Debtors' account with the purchase price of such Approved Receivable, less (a) any reserves; (b) any sums advanced to the Debtors, including the Advance; (c) any other charges authorized by the Factoring Agreement. On a weekly basis, the Senior Creditor would reconcile all charges and credits to the Debtors' account and make payment of any net credit balance to the Debtors. Trustee's Complaint, Ex. B, § 2.3. The Debtors were obligated to have at minimum, $3,500,000 in customer invoices available for purchase each month. Trustee's Complaint, Ex. B, § 3.4.

In exchange for the liquidity provided by the Factoring Agreement, the Debtors granted the Senior Creditor a first-priority security interest in all their assets. Trustee's Complaint, Ex. B, § 6.1.[7] Before the Petition Date, the Debtors and the Senior Creditor

---

Amendment, a June 19, 2017 Amendment, an August 21, 2017 Amendment, a June 27, 2018 Amendment, a July 24, 2018 Amendment, and copies of the Senior Creditor's UCC Financing Statements and amendments.

[7]    As part of the Debtors' motion seeking authority to use cash collateral (more fully described below), the Debtors acknowledged and affirmed that the Senior Creditor held a duly perfected, non-avoidable first priority security interest in all of the Debtors' assets to secure obligations under the Factoring Agreement. 18-31722 ECF No. 52.

amended the Factoring Agreement twelve times, adjusting the factoring rate and extending the expiration date.[8]

### ii.  The Junior Creditor Master Lease Agreement

On April 6, 2016, ServiCom entered into a Master Lease Agreement for the leasing of call center related equipment with Varilease Finance, Inc., a predecessor of the Junior Creditor (the "Lease Agreement").  Junior Creditor's Complaint, ¶ 13.  The Lease Agreement provided the Junior Creditor with a blanket lien on all of ServiCom's assets.[9] Junior Creditor's Complaint, ¶ 14.  JNET, Vitel, and ServiCom Canada separately executed guaranties of payment for the Lease Agreement.  Junior Creditor's Complaint, ¶ 16.[10]  As reflected in Proof of Claim 40-2 ("POC 40-2"), ServiCom owes the Junior Creditor approximately $1,842,646.66, exclusive of late charges, attorneys' fees, and costs.  Junior Creditor's Complaint, ¶ 17; *See also*, POC 40-2.[11]

### iii.  The Senior Creditor's Term Note

As noted above, ServiCom faced cash shortages at the end of 2017 with internal estimates forecasting it could be as much as $1,000,000 in the negative on a cash basis by the end of the year.  Trustee's Complaint, ¶¶ 66-67.  To remedy this cash shortage, Jefferson and Caldwell approached the Senior Creditor for a bridge loan.  The Senior

---

[8]  The twelve amendments to the Factoring Agreement were not attached to the Trustee's Complaint, but copies of the twelve amendments were attached to the Junior Creditor's Complaint and the Senior Creditor's Proof of Claim No. 79-3 ("POC 79-3").  The Trustee and the Junior Creditor objected to POC 79-3.  *See*, 18-31722 ECF Nos. 794, 797, 818, 845, 889, Audio of hearing held on February 6, 2020 at 02:22:00 – 02:23:40.  During the February 6, 2020 hearing, the court indicated a status conference would be held following this Decision to set a schedule for further resolution of the parties' disputes, including the objection to POC 79-3.

[9]  This Decision makes no findings as to the Junior Creditor's secured status and notes the Trustee reserved the right to challenge the Junior Creditor's secured status and the amount of its claim.  *See*, 19-3006 ECF No. 1.  However, for purposes of the pending motion for judgment, the court takes the factual allegations as true.  *See*, *Bryan v. Credit Control, LLC*, 954 F.3d at 580.

[10]  The Junior Creditor has no other collateral securing the obligations under the Lease Agreement.

[11]  The Junior Creditor also asserts an administrative claim in the amount of $122,792.79 for the monthly rent due November and December 2018 and January 2019.  18-31722 POC 40-2, p. 4.

Creditor refused.   Trustee's Complaint, ¶ 68.   Despite the initial refusal, the Senior

Creditor allegedly conspired with Jefferson and Caldwell and devised a plan for it to loan

ServiCom additional money by using funds provided by Jefferson and Caldwell.   Trustee's

Complaint, ¶¶ 69-71.   This plan resulted in the execution of the Secured Term Note (the

"Term Note") on November 21, 2017.   Trustee's Complaint, ¶¶ 71-73.

Under the terms of the Term Note, JNET promised to pay the Senior Creditor the

original principal sum of $750,000.00.   Trustee's Complaint, Ex. G.   Prior to any funds

being advanced by the Senior Creditor, Jefferson and/or Caldwell were required to

provide the Senior Creditor with collateral (in the form of cash) in an amount equal to the

total amount borrowed or requested to be borrowed.   Trustee's Complaint, Ex. G, § 2.1.

This cash provided by Jefferson and/or Caldwell was designated "Side Collateral."

Trustee's Complaint, ¶ 72.   In addition to the Side Collateral, the Term Note was secured

by any and all of the Debtors' collateral within the meaning of the Factoring Agreement.

Trustee's Complaint, Ex. G, § 6.1.

The Term Note was subsequently amended three times, extending its term, and

increasing its original principal balance to $1,000,000 and then to $1,400,000.   *See*, 18-

31722 ECF 279, p. 7; *see also*, Trustee's Complaint, ¶ 78.

### IV.   THE CHAPTER 11 BANKRUPTCY CASES

Even with the cash infusion from the Term Note, the Debtors' dire financial

situation did not improve.   On October 19, 2018 – the Petition Date – each Debtor filed a

voluntary Chapter 11 petition.   *See*, Voluntary Petitions in Case Nos. 18-31722, 18-

31723, 18-31724.   The court granted the Debtors' request to jointly administer the cases

for procedural purposes under Case No. 18-31722 pursuant to Fed.R.Bankr.P. 1015(b) and D.Conn.Bankr.L.R. 1015-1.  18-31722 ECF No. 11.[12]

As of the Petition Date, it was acknowledged the Senior Creditor held claims and security interests for several million dollars against all three Debtors, while the Junior Creditor held a claim and security interest for under $2,000,000 against the assets of ServiCom only.

Subsequently, the Senior Creditor's claim based on the Factoring Agreement was reduced by post-petition customer payments and, on March 12, 2019, it totaled $2,344,460.51.

### a. Paying Pre-Petition Payroll & Cash Collateral Orders

Upon filing, the Debtors immediately sought and received authority to use the Senior Creditor's cash collateral to pay pre-petition employee wages and to continue funding employee benefit programs pursuant to 11 U.S.C. §§ 105(a), 363(c), 507(a)(4). 18-31722 ECF Nos. 7, 53.  Because the Senior Creditor's financing vehicle was a factoring agreement, the Debtors also sought and received authority to use cash collateral for operating expenses pursuant to 11 U.S.C. §§ 363(b), (c) and to sell accounts receivable to the Senior Creditor pursuant to the terms of the Factoring Agreement.  18-31722 ECF Nos. 9, 52.  The resulting orders authorized the use of cash collateral to pay necessary expenses like payroll, and approved the sale of accounts receivable to the Senior Creditor pursuant to the Factoring Agreement but on modified terms.  18-31722 ECF Nos. 52, 53.  The order approving the sale of receivables under the Factoring

---

[12]      As previously mentioned, a fourth company, ServiCom Canada, filed a Chapter 11 petition days later, on October 23, 2018.  18-31734 ECF No. 1.  Thereafter, the court directed ServiCom Canada's case be jointly administered with the Debtors' cases.  *See*, 18-31722 ECF No. 29.  Ultimately, ServiCom Canada's case was closed on April 5, 2019.

Agreement provided the twelve pre-petition amendments to the Factoring Agreement were excluded, limited the term of the Factoring Agreement to the term of the order, and set the advance rate for approved receivables and unbilled receivables ("post-petition Factoring Agreement"). *See*, 18-31722 ECF 52, p. 3, fn1, p. 9. As adequate protection pursuant to 11 U.S.C. §§ 361, 362, 363, 503, and 507, the order granted the Senior Creditor a fully perfected, non-avoidable first priority lien on and security interest in all post-petition collateral of the same type and kind as the Senior Creditor's pre-petition collateral. In the event of any diminution in value of the pre-petition collateral resulting from the use of cash collateral, the order further granted the Senior Creditor a super priority claim for obligations incurred under the post-petition Factoring Agreement senior to all other administrative claims, except for a carve out for certain professionals. 18-31722 ECF 52, pp. 11-13, 11 U.S.C. §§ 361, 362, 363, 503, and 507.

Thereafter, the court entered five additional orders approving the use of cash collateral and the sale of receivables to the Senior Creditor on similar terms as the initial order. *See*, 18-31722 ECF Nos. 104, 154, 214, 279, 319. Of relevance to this Decision are the Fifth and Sixth Cash Collateral Orders ("Cash Collateral Orders") and their waiver provisions which Jefferson and Caldwell assert prohibit the Trustee's and Junior Creditor's claims. 18-31722 ECF Nos. 279, 319. The Cash Collateral Orders provide, in relevant part, that:

> Each other party, including any committee or trustee appointed in these Cases, shall have waived any right to
> (i)     challenge the validity, enforceability, perfection and priority of the Obligations to [the Senior Creditor] including the Secured Term Note,
>        …
> (iv)    [the Senior Creditor's] security interest and liens on the Debtor's assets; unless that party commenced in the Court an adversary proceeding seeking a challenge under Sections (i) – (iv) herein (a "Challenging Action"), on or before (a) for all parties in interest …, December 24, 2018, and (b) for the Official Committee

of Unsecured Creditors and the Vitel Installers, on or before January 4, 2019 (collectively, the "Challenge Deadline"). The Obligations and the priority of [the Senior Creditor's] security interest and liens on all assets of the Debtors, and all rights … Secured Term Note, shall be deemed, as against any party in interest that does not file a Challenging Action on or before the Challenging Deadline, to be legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination, **recharacterization** and otherwise unavoidable.
(the "Waiver Provision") 18-31722 ECF No. 279, ¶ 10; ECF No. 319, p. 7 (**emphasis added**).[13]

It is undisputed that no timely Challenging Action was filed.

### b. Debtors Stop Operating and Sell Customer Contracts

About six weeks after the Petition Date, on December 6, 2018, the Debtors ceased operating despite the Debtors' efforts to continue their businesses. The Debtors laid off virtually all employees due to significant cash shortfalls and the inability to pay payroll.

About a week later, JNET and ServiCom sought authority to sell and assign their call center service contracts with Allstate Motor Club, Inc., AT&T Services, Inc., OnStar Corporation LLC, and Sirius XM Radio Inc., to a third-party, MCI Canada, LC (the "Stalking Horse Bidder") for an initial bid of $400,000 pursuant to 11 U.S.C. §§ 105(a), 363(b), 365. 18-31722 ECF Nos. 199, 199-1, p. 6. Importantly, JNET sought to sell and assign its rights to the Sirius XM Radio Inc. and AT&T Services, Inc. contracts, while ServiCom sought to sell and assign its rights to the OnStar Corporation, LLC and Allstate Motor Club, Inc. contracts. 18-31722 ECF No. 289, Ex. A, §§ 2.1, 2.2. After a competitive

---

[13]    The Cash Collateral Orders define the term "Obligations" to include "all loans, advances, indebtedness, liabilities, obligations, debit balances, covenants and duties owing by a Debtor or any of the Debtor's subsidiaries or affiliates (whether arising thereunder or any "Other Agreement" (as defined therein)) to Coral Capital or Coral Capital's parent, subsidiary or affiliate of every kind and description (whether now or hereafter existing and whether arising under the Factoring Agreement, under any Other Agreement or otherwise), direct or indirect, absolute or contingent, due or to become due, including, without limitation, any indebtedness, liabilities or obligations owing by a Debtor to others which Coral Capital has acquired by assignment, participation or otherwise, and further including, without limitation, all interest, fees, charges, expenses, indemnification obligations and attorneys' fees for which a Debtor or any other person may be obligated under the Factoring Agreement or any Other Agreement." 18-31722 ECF No. 279, p. 7.

and robust in-court auction held on December 18, 2018, the court approved a sale, assumption, and assignment of the contracts to the Stalking Horse Bidder for a final bid of $1,500,000 pursuant to 11 U.S.C. § 363(b) (the "Auction").  *See*, 18-31722 ECF Nos. 264-266, 289.

Ten days after the Auction, on December 28, 2018, the Official Committee of Unsecured Creditors moved for the conversion of the cases to Chapter 7 cases or, in the alternative, the appointment of a Chapter 11 Trustee ("Motion to Convert") alleging Jefferson and Caldwell had grossly mismanaged the Debtors and should not be allowed to retain control.  18-31722 ECF No. 316.  In response, on January 9, 2019, the Debtors filed their own motion seeking to convert their cases to Chapter 7 cases pursuant to 11 U.S.C. § 1112(a).  18-31722 ECF No. 376.  In light of the sale of assets and the cessation of business, and in the absence of any objections, and, on expedited and limited notice, the court converted the Debtors' Chapter 11 cases to Chapter 7 cases on January 16, 2019.  18-31722 ECF No. 394.  Barbara H. Katz was appointed the Chapter 7 Trustee, and she is holding approximately $1,205,000 of unallocated net sale proceeds resulting from the Auction ("Auction Proceeds").  Junior Creditor's Complaint, ¶ 68.

    c.   The Senior Creditor's Motion to Disburse Auction Proceeds, Objections to the Senior Creditor's Proof of Claim and the Senior Creditor's Administrative Expense Claim

On March 14, 2019, the Senior Creditor moved for an order directing the Trustee to disburse the Auction Proceeds asserting its first priority lien entitled it to receive and apply the Auction Proceeds to its claim (the "Motion to Disburse").  18-31722 ECF No. 507.  The Trustee and the Junior Creditor objected and contested the amount of the Senior Creditor's claims.  18-31722 ECF Nos. 514, 516.

Shortly thereafter, on March 27, 2019, the Senior Creditor filed a claim for a super-priority, administrative expense claim pursuant to 11 U.S.C. § 364(c) totaling $730,719.75 for unpaid, post-petition accounts receivable purchased pursuant to the Factoring Agreement and the several Cash Collateral Orders (the "Administrative Claim"). 18-31722 ECF No. 562. The Senior Creditor also amended its proof of claim clarifying that the Senior Creditor's claim had been reduced from $9,391,630.54 (on the Petition Date) to $2,344,460.51 (on March 12, 2019) by the collection of Accounts Receivable. The Senior and Junior Creditors' relative debt claims are summarized in the following table:

| Claim | Amount | Source |
|---|---|---|
| Senior Creditor<br>Pre-Petition Factoring Agreement Claim, reduced by collected receivables, plus advances and other fees as of March 12, 2019 | $860,676.89 | POC 79-3 |
| Senior Creditor<br>Pre-Petition Term Note, including post-petition interest from October 2018 to March 12, 2019 | $1,483,783.62 | POC 79-3 |
| Senior Creditor<br>Super-Priority Post-Petition Administrative Claim pursuant to 11 U.S.C. § 364(c)(1) | $730,719.75 | 18-31722 ECF No. 562 |
| Junior Creditor<br>Pre-Petition Lease Agreement Claim, exclusive of fees, costs, and interest pursuant to 11 U.S.C. § 501 | $1,842,646.66 | POC 40-2 |
| Junior Creditor<br>Post-Petition Administrative Claim pursuant to 11 U.S.C. §§ 105(a), 503, 507 | $122,792.79 | 18-31722 ECF No. 511[14] |

The Trustee, the Junior Creditor, and, Jefferson and Caldwell objected to the Senior Creditor's Administrative Claim and to POC 79-3. 18-31722 ECF Nos. 646, 647, 807. After several status conferences and motions to modify scheduling orders, the court, at the parties' request, delayed consideration of the objections to the Senior Creditor's

---

[14] The Trustee objected to the Junior Creditor's administrative expense claim and the request for super-priority status but, at this time, the Junior Creditor is not requesting the court adjudicate its request. *See*, 18-31722 ECF No. 574 and docket entry dated April 10, 2019.

Motion to Disburse, Administrative Claim, and POC 79-3, to address the instant adversary proceedings and motions for judgment pursuant to Fed.R.Civ.P. 12(c).

On June 14, 2019, the parties here participated in an unsuccessful mediation of their disputes.  18-31722 ECF No. 755, 776.

  d. Summary of Claims by the Trustee and the Junior Creditor

One week after the failed mediation attempt, on June 21, 2019, the Junior Creditor filed its one-count complaint ("Junior Creditor Complaint") against Jefferson, Caldwell, and the Senior Creditor seeking the court apply a marshaling remedy to direct the Senior Creditor to immediately credit the $1,400,000 of funds being held (in cash) as "Side Collateral" for the Term Note to its claim (the "Junior Creditor Marshaling Count").  19-3005 AP-ECF No. 1.

The same day, the Trustee filed a seven-count complaint against Jefferson, Caldwell, and the Senior Creditor (the "Trustee's Complaint", and jointly with the Junior Creditor Complaint, the "Complaints").  19-3006 AP-ECF No. 1.  The counts in the Trustee's Complaint are summarized in the following table:

| Summary of Counts – 19-3006 (Trustee's Complaint) | | | |
|---|---|---|---|
| **Count** | **Asserted Against** | **Claim** | **Description** |
| 1 | Jefferson and Caldwell | Recharacterization | Trustee seeks judgment recharacterizing Side Collateral as equity contribution to ServiCom by Jefferson and Caldwell (the "Trustee's Recharacterization Count"). |
| 2 | Senior Creditor, Jefferson, and Caldwell | Marshaling | Trustee seeks judgment directing Senior Creditor to marshal assets and apply the $1,400,000 of funds held as Side Collateral to its outstanding claims (the "Trustee's Marshaling Count"). |
| 3 | Senior Creditor | Declaratory Judgment | Trustee seeks judgment concluding Senior Creditor's dominion and control over Side Collateral is sufficient for payment and deeming Side Collateral applied as of the Petition Date. |
| 4 | Senior Creditor | Aiding & Abetting Breach of Fiduciary Duty | The Trustee seeks judgment against Senior Creditor due to role in the Term Note transaction and creating the circumstances for ServiCom, an already insolvent company, to become even further indebted. |

| 5 | Senior Creditor | Violation of Connecticut Unfair Trade Practices Act | Trustee seeks damages against the Senior Creditor for unfair trade practices |
| 6 | Senior Creditor | Declaratory Judgment | Trustee seeks determination that $50,000.00 is a reasonable amount of attorney's fees reimbursable to the Senior Creditor pursuant to 11 U.S.C. § 506. |
| 7 | Senior Creditor | Objection to the Senior Creditor's Proof of Claim | Trustee objects to Senior Creditor's claim to an early termination fee, post-petition interest, and excessive attorney's fees. |

For purposes of this Decision, only the Trustee's Recharacterization and Marshaling Counts – Counts 1 and 2 – are relevant.

      e.  Senior Creditor's Response to the Complaints and Cross Claims

In its answer to the Trustee's Complaint, the Senior Creditor asserted approximately twenty-eight affirmative defenses applying to various allegations in the Trustee's Complaint. 19-3006 AP-ECF No. 45. In responding to the Junior Creditor's Marshaling Count, the Senior Creditor asserted seventeen affirmative defenses. 19-3005 AP-ECF No. 52. The Senior Creditor also filed two crossclaims against Jefferson and Caldwell for equitable indemnification and a breach of a validity guaranty. 19-3006 AP-ECF No. 45.

      f.  Jefferson and Caldwell's Response to the Complaints

Jefferson and Caldwell asserted eight and seven affirmative defenses in response to the Trustee's Recharacterization and Marshaling Counts, respectively. 19-3006 AP-ECF No. 35. Jefferson and Caldwell also filed a one-count counterclaim against the Trustee and a four-count crossclaim complaint against the Senior Creditor. 19-3006 AP-ECF No. 35.

In response to the Junior Creditor's Marshaling Count, Jefferson and Caldwell asserted seven affirmative defenses. 19-3005 AP-ECF No. 28. They also filed

counterclaims against the Junior Creditor seeking a declaratory judgment finding that if the Senior Creditor is required to marshal the Side Collateral, then Jefferson and Caldwell possess statutory and/or equitable subrogation rights against the bankruptcy estates pursuant to 11 U.S.C. § 509.  19-3005 AP-ECF No. 28.

g.  The Junior Creditor's Counterclaims Against Jefferson and Caldwell

The Junior Creditor responded by filing two counterclaims against Jefferson and Caldwell seeking: (1) to recharacterize their posting of cash as Side Collateral for the Term Note as an equity contribution to ServiCom (the "Junior Creditor Recharacterization Count"), and, (2) to equitably subordinate any claims of Jefferson and Caldwell to a position behind the Junior Creditor and all other unsecured creditors of the Estate (the "Equitable Subordination Count").   19-3005 AP-ECF No. 39.   Jefferson and Caldwell responded to the Junior Creditor Recharacterization Count by asserting eight affirmative defenses.  19-3005 AP-ECF No. 83.

h.  Jefferson and Caldwell's Motions for Judgment on the Pleadings

On October 7, 2019, Jefferson and Caldwell filed the instant motions seeking a judgment determining the Trustee and the Junior Creditor cannot prevail on their respective Marshaling and Recharacterization Counts pursuant to Fed.R.Civ.P. 12(c) ("Rule 12(c) Motions").  19-3005 AP-ECF No. 87; 19-3006 AP-ECF No. 74.  Jefferson and Caldwell assert the Marshaling Counts fail because: (1) neither the Trustee nor the Junior Creditor can meet the requirement there be a common debtor with ownership of two funds (the "Common Debtor Requirement"); (2) the Trustee and the Junior Creditor are unable to meet any exception to the Common Debtor Requirement; and (3) the claim is barred by the waiver and bar provisions of the Cash Collateral Orders.  19-3005 AP-ECF No. 89; 19-3006 AP-ECF No. 76.

As to the Recharacterization Counts, Jefferson and Caldwell assert: (1) neither the Trustee nor the Junior Creditor can establish the required elements of such a claim; and, (2) such a claim is barred by the waiver and bar provision of the Cash Collateral Orders. 19-3005 AP-ECF No. 89; 19-3006 AP-ECF No. 76.

The Senior Creditor filed a joinder motion to the Rule 12(c) Motions.  19-3005 AP-ECF No. 104; 19-3006 AP-ECF No. 92.

    i.   Objections to the Rule 12(c) Motion

The Junior Creditor objected to the Rule 12(c) Motion arguing it is premature.  19-3005 AP-ECF No. 106.  In the alternative, the Junior Creditor asserted it must be denied because: (1) its Marshaling and Recharacterization Counts plead sufficient facts to assert legally sufficient claims; and, (2) several issues of fact remain to be determined at trial. 19-3005 AP-ECF No. 106.[15]

The Trustee objected asserting she sufficiently pleaded both Marshaling and Recharacterization causes of action, and, that neither claim is barred by the Cash Collateral Orders.  19-3006 AP-ECF No. 94.

## V.    __APPLICABLE LAW__

    a.  Standard of Review for Motions for Judgment

Federal Rule of Civil Procedure 12(c) permits a party to seek judgment on the pleadings, after the filing of an answer, *i.e.*, when the pleadings are closed (a "Rule 12(c) Motion").  Fed.R.Civ.P. 12(c).[16]  In evaluating a Rule 12(c) Motion, courts apply the "same standard applicable to Fed.R.Civ.P. 12(b)(6) motions to dismiss."  *Ezra v. Weitz &*

---

[15]    Jefferson and Caldwell replied to the objection and the Junior Creditor filed a sur-reply. *See*, 19-3005 AP-ECF Nos. 127, 134.

[16]    Any motion pursuant to Fed.R.Civ.P. 12(c) must be made early enough so as not delay trial. Fed.R.Civ.P. 12(c).

*Luxenberg, P.C.*, 794 Fed.Appx. 27, 28 (2d Cir. 2019)(Summary Order)(*citing Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010)).  Thus, a court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor."  *Bryan v. Credit Control, LLC*, 954 F.3d 576, 580 (2d Cir. 2020). "Because hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense, federal courts are unwilling to grant a motion under Rule 12(c) unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."  *Gioconda L. Group PLLC v. Kenzie*, 941 F.Supp. 2d 424, 427 (S.D.N.Y. 2013)(internal citations omitted).

In this process, a court may consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)(*quoting, Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)). To survive a Rule 12(c) Motion, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  While the parties filed voluminous documents attached to their memoranda of law, nothing requires "the Court to review portions of the record in response to a motion, where the moving and opposition papers do not make specific reference to such portions of the record."  D.Conn.L.Civ.R. 7(a)(3); *See, e.g.*, 19-3005 AP-ECF Nos. 89; 106, Exs. A, B;  19-3006 AP-ECF Nos. 76; 94, Exs. A-C.  Further, as this Rule 12(c) Motion is not a motion for summary judgment where anything other than the court's own record of the case and the allegations of the Complaints are examined, the record for this Decision does not include such extraneous materials.

"[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead[.]"  *Heckman v. Town of Hempstead*, 568 Fed.Appx. 41, 43 (2d Cir. 2014)(summary order)(*citing, Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 50 (2d Cir.1991)).  Federal Rule of Civil Procedure 15(a), made applicable to this adversary proceeding by Fed.R.Bankr.P. 7015, provides that "leave to amend should be freely give[n] ... when justice so requires."  Fed.R.Civ.P. 15(a)(2); *See also*, *Clark v. New York City Hous. Auth.*, 20CIV251PAEGWG, 2021 WL 202998, at *1 (S.D.N.Y. Jan. 21, 2021)(Under Rule 15(a), a court must "freely" give leave to amend, Fed.R.Civ.P. 15(a)(2), which normally involves an analysis of the four factors articulated in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962): undue delay, bad faith, futility of amendment, or undue prejudice to the opposing party).

b.  Marshaling

Marshaling is an equitable principle requiring "a senior [secured] creditor, having two funds available to satisfy a single debt, to resort first to the fund that is not available to a junior [secured] creditor of the same debtor in order to avoid the inequity which would result from the senior [secured] creditor's election to proceed against the only fund available to the junior [secured] creditor, thereby preventing the junior [secured] creditor from obtaining any satisfaction of its debt."  *In re Murphy*, 331 B.R. 107, 132 (Bankr.S.D.N.Y. 2005)(*citing Walther v. Bank of New York*, 772 F.Supp. 754, 766–67 (S.D.N.Y. 1991)).  Marshaling "deals with the rights of all who have an interest in the property involved and is applied only when it can be equitably fashioned as to all of the parties." *In re Elmwood Farms, Inc.*, 30 B.R. 282, 291 (Bankr.S.D.N.Y. 1983)(*citing Meyer v. United States*, 375 U.S. 233 (1963)).  A trustee "has standing to invoke marshaling

because [she] has the status of a hypothetical lien creditor." *In re Glob. Serv. Group, LLC*, 316 B.R. 451, 463 (Bankr.S.D.N.Y. 2004); *See also*, 11 U.S.C. § 544(a)(2).

A proponent of a marshaling claim generally must plead and prove by clear and convincing evidence three elements, including:

1) the existence of two secured creditors with a single common debtor;
2) the existence of two funds belonging to the common debtor; and
3) the right of the senior secured creditor to receive payment from more than one fund while the junior secured creditor can only resort to one fund.
*See, In re Arlco, Inc.*, 239 B.R. 261, 274 (Bankr.S.D.N.Y. 1999).

A claim for marshaling will generally not lie where it would "prejudice the rights or interests of the party entitled to the double fund, [or] do injustice to the common debtor, [or] operate inequitably on the interests of other persons." *Greenwich Tr. Co. v. Tyson*, 27 A.2d 166, 174 (Conn. 1942).

"The *sine qua non* for invoking the doctrine is that the two sources of assets to which the creditors wish to resort for satisfaction of their liens, must be held by a *common debtor*" (the "Common Debtor Requirement"). *In re Elmwood Farms, Inc.*, 30 B.R. at 291 (*italics in original*).[17]

There are exceptions to the Common Debtor Requirement. Some courts find the Common Debtor Requirement is satisfied when a guarantor, who is also a controlling shareholder, provides a creditor with the primary collateral needed to obtain a working capital loan to continue the operation of the debtor corporation. Courts permitting marshaling under this scenario consider the collateral pledged by the guarantor/shareholder to be the equivalent of a capital contribution to the corporation

---

[17] "If one creditor has a claim against debtors A and B, and a second creditor has a claim against debtor B only, the second creditor cannot compel the first creditor to seek satisfaction from A first, unless the common debtor B has a right to demand that A bear the initial liability, as where B is a surety of A." *In re Elmwood Farms, Inc.*, 30 B.R. at 291.

24

which a court in equity should consider as a fund of the corporation itself (the "working capital exception").  *See*, *In re Jack Green's Fashions for Men--Big and Tall, Inc.*, 597 F.2d 130 (8th Cir. 1979); *Farmers & Merchants Bank v. Gibson*, 7 B.R. 437 (Bankr.N.D.Fla. 1980), *vacated sub nom. Peacock v. Gibson*, 81 B.R. 79 (N.D.Fla. 1981); *compare with In re United Med. Research, Inc.*, 12 B.R. 941, 943 (Bankr.C.D.Cal. 1981)("It is poor policy for courts to upset legitimate business transactions because of some vague concept of equity. We tend to forget that these decisions affect future commercial transactions. Advantageous and proper loans to corporations may be frustrated because shareholders would be fearful of having their personal assets marshaled for corporate creditors should they guarantee a corporate debt.").

Most courts, including those in the Second Circuit, permit an exception to the Common Debtor Requirement but require the proponent to plead and prove that the shareholder/guarantor and the corporation were alter-egos, or, plead and prove some fraud or inequitable conduct on the part of the shareholder/guarantor that would justify piercing the corporate veil.  *See*, *In re Glob. Serv. Group, LLC*, 316 B.R. at 463 (declining to adopt what it considered the minority view and concluding Chapter 7 Trustee failed to plead facts showing fraud or other conduct that would allow for piercing the corporate veil); *In re Tampa Chain Co., Inc.*, 53 B.R. 772, 778 (Bankr.S.D.N.Y. 1985)(shareholders' use of the corporate bank account as a personal piggy bank justified disregarding corporate veil, and, finding the Common Debtor Requirement satisfied); *See also, In re Vermont Toy Works, Inc.*, 135 B.R. 762, 769 (D.Vt. 1991)(finding the record devoid of evidence of fraud or personal use of corporate funds that would support piercing the corporate veil).  It should be noted that "[e]xceptions to the common debtor rule are not easily proven."  *In re Am.'s Hobby Ctr., Inc.*, 223 B.R. 275, 288 (Bankr.S.D.N.Y. 1998).

JNET and ServiCom are both Delaware limited liability companies and the parties agree Delaware law applies to the determination of whether Plaintiffs sufficiently pleaded a claim to pierce the Debtors' corporate veil.  *See*, 19-3005 AP-ECF No. 89, p. 12; 19-3006 AP-ECF No. 94, p. 35; 76, p. 12-13.  In evaluating the circumstances under which the separate existence of a Delaware limited liability company should be set aside and those who are at its helm held personally liable for the company's debts and obligations, the law of the state of Delaware should control.  *See, Official Committee of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 133 (Bankr.S.D.N.Y. 2009)(*citing, Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir. 1995) ("The law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.")); *American Fuel Corp. v. Utah Energy Development Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) ("where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry").

The equitable theory of piercing the corporate veil permits a court to impose personal liability on a corporation's owner when there is fraud or when the corporation "is in fact a mere instrumentality or alter ego of its owner."  *Wilson v. Thorn Energy, LLC*, 787 F.Supp. 2d 286, 294 (S.D.N.Y. 2011)(*citing, NetJets Aviation, Inc. v. LHC Commun., LLC*, 537 F.3d 168, 176 (2d Cir. 2008)).   A "plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness."  *NetJets Aviation, Inc.*, 537 F.3d at 176.

Under the fraud prong, a plaintiff must prove either "that the corporation was created with fraud or unfairness in mind [or] that it was so used."  *NetJets Aviation, Inc.*, 537 F.3d at 177.  "[F]raud consists of [] 'an intent to induce the plaintiff to act or to refrain

26

from acting.'" *In re Foxmeyer Corp.*, 290 B.R. 229, 241 (Bankr.D.Del. 2003)(*citing Stephenson v. Capano Development, Inc.,* 462 A.2d 1069, 1074 (Del.1983)). Additionally, a "fraud or injustice sufficient to pierce the corporate veil of a subsidiary or subsidiaries exists if a parent drains assets out of the same." *In re Foxmeyer Corp.*, 290 B.R. at 242. "When the complaint alleges fraud, however, Rule 9(b) imposes the added requirement that the complaint 'state with particularity the circumstances constituting fraud.'" *Ramiro Aviles v. S & P Glob., Inc.*, 380 F.Supp. 3d 221, 256–57 (S.D.N.Y. 2019); Fed.R.Civ.P. 9(b). "[T]he particularity requirements of Rule 9(b), [ ] necessitate the pleading of particularized facts that give rise to a strong inference that defendant[ ] acted with fraudulent intent." *EED Holdings v. Palmer Johnson Acq. Corp.*, 228 F.R.D. 508, 512 (S.D.N.Y. 2005)(internal quotations and citations omitted).

The Second Circuit has explained that two elements must be established to pierce the corporate veil on an alter-ego theory under Delaware law. First, the entities must "operate[ ] as a single economic entity," and, second, there must be an "overall element of injustice or unfairness." *Varbero v. Belesis*, 20-CV-2538 (LJL), 2020 WL 5849516, at *3 (S.D.N.Y. Oct. 1, 2020)(*citing, NetJets Aviation, Inc.*, 537 F.3d at 177). Simply phrased, the standard may be restated as: "whether [the two entities] operated as a single economic entity such that it would be inequitable for th[e] Court to uphold a legal distinction between them." *NetJets Aviation, Inc.*, 537 F.3d at 177 (internal citations omitted).[18]

---

[18]    *See also*, *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183–84 (Del.Ch. 1999)(In order to state a cognizable claim to pierce the corporate veil of the General Partner, plaintiffs must allege facts that, if taken as true, demonstrate the Officers' and/or the Parents' complete domination and control of the General Partner. The degree of control required to pierce the veil is "exclusive domination and control ... to the point that the General Partner no longer has legal or independent significance of its own.").

While, JNET and ServiCom are limited liability companies,[19] the hurdle to disregarding their form is the same as if they were corporations. *See, NetJets Aviation, Inc.*, 537 F.3d at 176 ("Emerging caselaw illustrates that situations that result in a piercing of the limited liability veil are similar to those that warrant piercing the corporate veil … Every state that has enacted LLC piercing legislation has chosen to follow corporate law standards and not develop a separate LLC standard."). Under Delaware law, "the members of an LLC generally are not liable for the debts of the entity, and a plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces a difficult task." *NetJets Aviation, Inc.*, 537 F.3d at 176.

In considering whether two entities operated as a single economic entity, courts look at the following factors:[20]

1) whether the company was adequately capitalized for the undertaking;
2) whether the company was solvent;
3) whether corporate formalities were observed;[21]
4) whether the dominant shareholder siphoned company funds; and
5) whether, in general, the company simply functioned as a facade for the dominant shareholder."

*CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, CV 2018-0783-PRW, 2020 WL 3564622, at *23 (Del.Ch. June 29, 2020).

"No one factor dominates the inquiry." *New York Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F.Supp.3d 216, 230 (S.D.N.Y. Aug. 21, 2020). "[W]hether to disregard the corporate form on these grounds requires a fact intensive inquiry." *Wenske v. Blue*

---

[19]     The term "limited liability company" is commonly abbreviated as "LLC."

[20]     "While no single factor justifies a decision to disregard the corporate entity, some combination of [factors] is required, and an overall element of injustice or unfairness must always be present, as well." *In re BH S & B Holdings LLC*, 420 B.R. at 134.

[21]     When those formalities are not respected, the legal fiction of corporateness becomes less "real" in the everyday experience of those involved in the firm's operations and any expectation that others would treat it as a distinct, liability-limiting entity becomes less reasonable. *David v. Mast*, 1999 WL 135244, at *2 (Del.Ch. Mar. 2, 1999)(internal citation omitted); *See also, NetJets Aviation, Inc.*, 537 F.3d at 177 (court reviewed as part of its analysis of whether corporate formalities were observed additional information, including: whether dividends were paid, corporate records kept, and officers and directors functioned properly).

*Bell Creameries, Inc.*, CV 2017-0699-JRS, 2018 WL 5994971, at *7 (Del.Ch. Nov. 13, 2018)(concluding the plaintiff's complaint fell short of pleading that the corporate structure caused fraud or similar injustice).

Undercapitalization is rarely sufficient on its own to pierce the corporate veil. *See*, *In re BH S&B Holdings LLC*, 420 B.R. at 136 ("The inquiry is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business.")(internal citations omitted); *See also, In re RSL COM PRIMECALL, Inc.*, 01-11457(ALG), 2003 WL 22989669, at *16 (Bankr.S.D.N.Y. Dec. 11, 2003)("If lack of adequate capitalization were alone enough to justify piercing the corporate veil, the veil of every insolvent subsidiary or failed start-up corporation could be pierced.").

"In the alter-ego analysis of an LLC, somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required." *NetJets Aviation, Inc.*, 537 F.3d at 178.

While a plaintiff need not show fraud to satisfy a showing of unfairness or injustice, the requisite showing should be "similar in nature to fraud or a sham" and "must, in particular, be found in the defendants' use of the corporate form." *In re BH S & B Holdings LLC*, 420 B.R. at 134 (quotations omitted)*; see also*, *NetJets Aviation, Inc.*, 537 F.3d at 183 ("[t]he 'injustice' that must be shown in order to pierce the veil on an alter-ego theory must be more than the breach of contract alleged in the complaint"); *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 241 F.Supp.3d 461, 475 (S.D.N.Y. 2017)("To make the second, injustice or unfairness showing, a plaintiff must establish that the LLC effectively exists as a sham or shell through which the parent perpetrates injustice.").

c.  Recharacterization

Both the Trustee and the Junior Creditor seek to recharacterize the funds Jefferson and Caldwell pledged to the Senior Creditor as Side Collateral as an equity contribution to ServiCom and/or JNET.   "Recharacterization of a claim from debt to equity 'is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*.'"   *In re TransCare Corp.*, 602 B.R. 234, 243 (Bankr.S.D.N.Y. 2019)(*citing, Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.),* 269 F.3d 726, 747-48 (6th Cir. 2001)).  "[B]ankruptcy courts, as an element of their equity powers, have the ability to ensure that "substance will not give way to form," and that "technical considerations will not prevent substantial justice from being done."   *In re Adelphia Commun. Corp.*, 365 B.R. 24, 73 (Bankr.S.D.N.Y. 2007).  "Recharacterization prevents an equity investor from labeling its contribution as a loan and subverting the Bankruptcy Code's critical priority system by guaranteeing itself a higher priority — and a larger recovery — should the debtor file for bankruptcy."  *In re Nilhan Developers, LLC*, 620 B.R. 385, 416 (Bankr.N.D.Ga. 2020)(*citing, In re Dornier Aviation (N. Am.) Inc.*, 453 F.3d 225, 231 (4th Cir. 2006).

In considering a recharacterization claim, courts in the Second Circuit analyze the eleven-factors set forth in *In re AutoStyle*, including:

1)  the names given to the instruments, if any, evidencing the indebtedness;
2)  the presence or absence of a fixed maturity date and schedule of payments;
3)  the presence or absence of a fixed rate of interest and interest payments;
4)  the source of repayments;
5)  the adequacy or inadequacy of capitalization;
6)  the identity of interest between the creditor and the stockholder;
7)  the security, if any, for the advances;
8)  the corporation's ability to obtain financing from outside lending institutions;

30

9) the extent to which the advances were subordinated to the claims of outside creditors;

10) the extent to which the advances were used to acquire capital assets; and

11) the presence or absence of a sinking fund to provide repayments.

(the "*AutoStyle* Factors").  *AutoStyle*, 269 F.3d at 749-50.

The *AutoStyle* Factors were derived from a tax court case as a general framework for assessing recharacterization claims.  *AutoStyle*, 269 F.3d at 750 (*citing, Roth Steel Tube Co. v. C.I.R.*, 800 F.2d 625 (6th Cir. 1986)).  The *AutoStyle* Factors are meant to be a guide, not a score card; no one factor is necessary or dispositive and the weight of each factor is a function of the circumstances in which the transaction occurred.  *See*, *In re AutoStyle*, 269 F.3d at 749–50.  These factors are intended to assist a court in its overarching inquiry of "whether the parties called an instrument one thing when in fact they intended it as something else."  *In re SubMicron Sys. Corp.*, 432 F.3d 448, 456 (3d Cir. 2006).

"[A] 'paradigmatic' recharacterization case involves a situation where 'the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.'"  *In re BH S & B*, 420 B.R. at 157 (*quoting, In re Adelphia Commun. Corp.*, 365 B.R. at 74); *See also*, *In re Eternal Enterprises, Inc.*, 557 B.R. 277, 289 (Bankr.D.Conn. 2016)(court determined the purported loans made by debtor's principals to the debtor company had the substance and character of equity contributions).  Recharacterization should not be used to discourage good-faith loans as, in many cases, an insider will be the only party willing to make a loan to a struggling business.  *In re Rockville Orthopedic Associates, P.C.*, 377 B.R. 438, 442–43 (Bankr.D.Conn. 2007).

d.  Substance Over Form Doctrines

Both the Trustee and the Junior Creditor support their Marshaling and Recharacterization Claims by reference to legal doctrines known as the step-transaction doctrine, the collapsing transactions doctrine, the integrated transaction doctrine, or, the economic substance doctrine.  Under all these doctrines the principle is the same, and, a court evaluates a transaction for its substance, rather than its form.

The step transaction doctrine is a tool of statutory interpretation developed from the substance-over-form doctrine.  Courts employ the substance-over-form doctrine as "a tool to prevent taxpayers from mislabeling transactions to avoid tax consequences they don't like; … [t]hus, when the taxpayer's formal characterization of a transaction fails to capture economic reality and would distort the meaning of the [Tax] Code in the process, form properly gives way to substance."  *Benenson v. Commr. of Internal Revenue,* 910 F.3d 690, 699 (2d Cir. 2018).  Under the step transaction doctrine, "steps in a series of formally separate but related transactions … [are] treated 'as a single transaction' for purposes of identifying economic reality "if all the steps are substantially linked." *Benenson*, 910 F.3d 690, 701 (2d Cir. 2018).  The step transaction doctrine has been applied in the tax law context, and also in the context of bankruptcy cases involving fraudulent conveyances.  *See, Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993)("an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.")(internal citations omitted); *See also, Salomon Inc. v. United States*, 976 F.2d 837 (2d Cir.1992)(tax context).

The step transaction doctrine has been referred to as the integrated transaction doctrine, and also, as the collapsing transaction doctrine.  See, *In re Waterford*

*Wedgwood USA, Inc.*, 500 B.R. 371, 379-380 (Bankr.S.D.N.Y. 2013)("If the various closely related transactions are just means to reach a particular result, the court will view them as a single transaction").  In *Waterford Wedgwood*, the court found it appropriate to collapse two sales agreements and treat them as one integrated transaction where the documents indicated they should be consummated substantially contemporaneously, the sales were each conditioned on the other, and the purchase price delivered by a single wire transfer.  *In re Waterford Wedgwood USA, Inc.*, 500 B.R. at 380.  Courts have applied the collapsing transactions doctrine in cases involving fraudulent transfers to "allow[] the bankruptcy court to 'collapse' various 'legs' of a transaction [] and deem the entire chain of transfers avoidable.  *In re M. Fabrikant & Sons, Inc.,* 541 Fed.Appx. 55, 57 (2d Cir. 2013)(summary order).

In deciding whether to collapse the transaction and impose liability on particular defendants, "courts have looked frequently to the knowledge of the defendants of the structure of the entire transaction and to whether its components were part of a single scheme." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635–36 (2d Cir. 1995)(*quoting, In re Best Products*, 168 B.R. 35, 56–57 (Bankr.S.D.N.Y. 1994); *see also, In re Best Products Co., Inc.*, 157 B.R. 222, 230 (Bankr.S.D.N.Y. 1993)(court cannot conclude that [the debtor] and [the lender] intended a loan from [the lender] to [the subsidiary], a subsidiary with no assets and no accounts. Rather, at bottom, this transaction was a loan from [the lender] to [the debtor] with [the subsidiary] serving as a vehicle to "get around" the antideficiency rules.).  In *Adelphia Recovery Trust v. FPL Group, Inc. (In re Adelphia Commc'ns Corp.)*, 512 B.R. 447 (Bankr.S.D.N.Y. 2014), Bankruptcy Judge Robert E. Gerber identified three factors for a court to analyze when determining whether to collapse a transaction, including:

1) whether all of the parties involved had knowledge of the multiple transactions;
2) whether each transaction would have occurred on its own; and
3) *whether each transaction was dependent or conditioned on other transactions.*
*In re Adelphia Commun. Corp.*, 512 B.R. at 491-492.

There, Judge Robert E. Gerber declined to collapse the transactions where each transaction could have occurred on its own, and indeed, each was set to occur on its own, independently, and at different times. *In re Adelphia Commun. Corp.*, 512 B.R. at 491-492; *see also, Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537, 546–47 (Bankr.D.Del. 2005)("all knew about the multiple steps of the transaction. Each step of the Transaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent."). "The collapsing concept is usually applied when a series of transactions actually comprise a single integrated transaction, notwithstanding the fact that the formal structure erected and labels attached make them appear distinct." *In re Old CarCo LLC*, 435 B.R. 169, 185 (Bankr.S.D.N.Y. 2010)(concluding that, although intent is ordinarily a factual issue, the deal documents expressly showed an intent that the transaction be integrated)(internal citations omitted).

Similar to the step transaction doctrine, the economic substance doctrine "is a common law rule that allows courts to question the validity of a transaction … if the transaction at issue lacks 'economic substance.'" *Bank of New York Mellon Corp. v. C.I.R.*, 801 F.3d 104, 113 (2d Cir. 2015). The economic substance doctrine effectuates the Supreme Court's command that the tax effect of a transaction should be based on the "objective economic realities of a transaction rather than to the particular form the parties employed." *Frank Lyon Co. v. U.S.*, 435 U.S. 561, 573 (1978). Applying the economic

substance doctrine, a court may "ignore for tax purposes [a] sham transaction, *i.e.*, a transaction designed to create tax benefits rather than to serve a legitimate business purpose." *Hines v. United States*, 912 F.2d 736, 739 (4th Cir. 1990). "In determining whether a transaction lacks 'economic substance,' [courts] consider: 1) whether the taxpayer had an objectively reasonable expectation of profit, apart from tax benefits, from the transaction; and 2) whether the taxpayer had a subjective non-tax business purpose in entering the transaction." *Bank of New York Mellon Corp. v. C.I.R.*, 801 F.3d at 115 (*citing, Gilman v. Comm'r*, 933 F.2d 143, 147–48 (2d Cir.1991). The two-step test is not rigid, but rather is, "a 'flexible' analysis where both prongs are factors to consider in the overall inquiry into a transaction's practical economic effects." *Bank of New York Mellon Corp. v. C.I.R.*, 801 F.3d at 115.

> e. Law of the Case

Under the law-of-the-case doctrine, once a court has ruled on an issue, "that decision should generally be adhered to by that court in subsequent stages in the same case." *U.S. v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009)(*citing, United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir.2002)).[22] An "[a]ctual decision of an issue is required to establish the law of the case." *Russo v. City of Hartford*, 419 F. Supp. 2d 134, 142 (D.Conn. 2006). The doctrine is "discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Ashby v. Quiros*, 443 F.Supp. 3d 232, 251 (D.Conn. 2020)(*citing, Virgin Atl. Airways v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.

---

[22]     Then-Judge Neil M. Gorsuch wrote that without something like the law of the case doctrine, "an adverse judicial decision would become little more than an invitation to take a mulligan, encouraging lawyers and litigants alike to believe that if at first you don't succeed, just try again. A system like that would reduce the incentive for parties to put their best effort into their initial submissions on an issue, waste judicial resources, and introduce even more delay into the resolution of lawsuits" *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016).

1992); *See also, Arizona v. California*, 460 U.S. 605, 618 (1983)("Law of the case directs a court's discretion, it does not limit the tribunal's power."). A court may revisit a prior decision for "cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Nettelton v. Astrue*, 3:11CV1357 JBA, 2013 WL 1390042, at *2 (D.Conn. Apr. 4, 2013).

## VI.    DISCUSSION

### a.  Marshaling

The Plaintiffs' goal is to compel the Senior Creditor to apply the Side Collateral pledged by Jefferson and Caldwell to its claim, thereby increasing the available funds in the bankruptcy estate to disburse to the Junior Creditor and possibly other creditors of the Estate. But, the Trustee and the Junior Creditor have a common debtor problem. In order to survive the Rule 12(c) Motions, the Trustee and the Junior Creditor's Marshaling Counts must contain sufficient factual allegations, which if accepted as true, plausibly assert: (1) the existence of multiple secured creditors with a common debtor; (2) the existence of two funds belonging to the common debtor ("Common Debtor Requirement");[23] and, (3) the right of the senior secured creditor to payment from both funds, with a junior secured creditor holding rights to only one fund. The two funds here are the unallocated Auction Proceeds held by the Trustee (of approximately $1,205,000), and, the Side Collateral held by the Senior Creditor ($1,400,000). It is undisputed the unallocated Auction Proceeds stem from the sale of ServiCom's and JNET's customer

---

[23]     Some decisions suggest the Common Debtor Requirement is compromised of the first two elements. For purposes of clarity in this Decision, the Common Debtor Requirement refers to the second element of a marshaling claim – the existence of two funds belonging to a common debtor.

contract rights and, hence, belong to the bankruptcy estates of JNET and ServiCom.  18-31722 ECF No. 289.   The Side Collateral, however, does not presently "belong" to ServiCom or JNET, but rather constitutes funds pledged by Jefferson and Caldwell held by the Senior Creditor.   Ordinarily, the Common Debtor Requirement is, "not met where the two funds sought to be marshaled are held separately by a corporation and its shareholder even though [the shareholder] guaranteed corporate debt."   *In re Tampa Chain Co., Inc.*, 53 B.R. at 778 (*citing Gibson*, 7 B.R. at 440).

While I conclude the Complaints adequately pleaded the first and third marshaling requirements, those elements warrant a brief discussion before addressing the problematic second element.

### i.  The First Element

As to the first requirement – two or more secured creditors of a single, common debtor – the Trustee's and the Junior Creditor's use of defined terms results in a lack of precision.

### a)  As to the Trustee's Complaint

Confusingly, the Trustee asserts in her opposition to the Rule 12(c) Motion that JNET is the common debtor, but her Complaint lacks clarity by generically referencing ServiCom throughout, with an almost complete lack of facts related to JNET alone. *Compare*, 19-3006 AP-ECF No. 94, p. 34 and Trustee's Complaint, p. 26, ¶¶ 162-164. *See also,* Trustee's Complaint, footnote 1.  For example, the Trustee fails to reference JNET (as opposed to the generic "ServiCom") even once in the Marshaling Count.  *See*, Trustee's Complaint, p. 25, ¶¶ 161-168.  Even with this confusion, as a hypothetical lien creditor pursuant to 11 U.S.C. § 544, the Trustee is considered a secured creditor of both

JNET and ServiCom.[24]  *See*, *In re Glob. Serv. Group, LLC*, 316 B.R. at 463; *See also*, 11 U.S.C. § 544(a)(2); Trustee's Complaint, p. 26, ¶¶ 1, 163-164.  The other secured creditor of both JNET and ServiCom is undisputedly the Senior Creditor.  Trustee's Complaint, p. 26, ¶¶ 163-164.  Hence, the requirement of two or more secured creditors with a common debtor is satisfied in the Trustee's Complaint whether the common debtor is determined to be ServiCom or JNET.

Interestingly, Jefferson and Caldwell argue the Marshaling Counts fail because they – Jefferson and Caldwell – are not debtors of the Trustee or the Junior Creditor.  19-3006 AP-ECF No. 76, p. 9.  But neither Marshaling Count alleges Jefferson and Caldwell are the common debtor for purposes of marshaling.

As discussed below, the question then moves to whether two funds belong to the common debtor (whether ServiCom or JNET).  Because the Side Collateral presently belongs to neither ServiCom or JNET, if JNET were to be considered the common debtor, the Side Collateral would need to first be recharacterized as an equity contribution to JNET.  Or, there must be a basis for the court to disregard the separate identity of JNET from Jefferson and Caldwell, and, to treat the Side Collateral pledged to the Senior Creditor by Jefferson and Caldwell as an asset of JNET.

If ServiCom were to be considered the common debtor two steps would be required.  First, the Side Collateral would need to be recharacterized as an equity contribution to JNET, and second, there would need to be a basis for the court to disregard the separate identity of JNET from ServiCom to treat the equity contribution as one to ServiCom.  In the alternative, the Trustee would need to show a basis for the court

---

[24]    Jefferson and Caldwell have not challenged the Trustee's standing as a hypothetical lien creditor of the Debtors.  *See,* 11 U.S.C. § 544.

to disregard the separate identity of ServiCom from Jefferson and Caldwell, and, to treat the Side Collateral pledged to the Senior Creditor by Jefferson and Caldwell as an asset of ServiCom.  For the reasons described below, the Trustee's Complaint fails to plead sufficient facts to satisfy these multiple steps.

b)  As to the Junior Creditor's Complaint

The Junior Creditor's Complaint alleges that the Senior Creditor and the Junior Creditor are both secured creditors of ServiCom.  *See*, Junior Creditor's Complaint, ¶¶ 72-73.  These allegations satisfy the requirement that there be two or more secured creditors of a single common debtor.

The Junior Creditor's problem is that a two-step recharacterization effort must succeed before ServiCom may be considered a common debtor of the Senior Creditor and the Junior Creditor.  Like the Trustee, the Junior Creditor must demonstrate a basis to: 1) recharacterize the Side Collateral as an equity contribution to JNET; and, 2) disregard the separate identities of JNET and ServiCom to treat the equity contribution as one to ServiCom.  Alternatively, the Junior Creditor must show a basis for the court to disregard the separate identities of ServiCom versus Jefferson and Caldwell, and, to treat the Side Collateral pledged to the Senior Creditor by Jefferson and Caldwell as a capital contribution belonging to ServiCom.

Unlike the Trustee, who can be considered a secured creditor of JNET, the Junior Creditor holds no security interest in JNET's assets, and instead holds only an unsecured claim as to JNET.  But marshaling requires the existence of two *secured* creditors with a single common debtor.  Here, the Senior Creditor and Junior Creditor are both secured creditors as to ServiCom, but only the Senior Creditor is secured as to JNET.  Hence, the

Junior Creditor's Complaint depends upon ServiCom being considered the common debtor. [25]

### ii.  The Third Element

The parties do not dispute the third element.  All parties acknowledge the Marshaling Counts sufficiently pleaded that presently the Senior Creditor holds a right to payment from either the Auction Proceeds or the Side Collateral (the two funds), while the Trustee and the Junior Creditor can recover only from the Auction Proceeds and hold no security interest in the Side Collateral.  *See*, Junior Creditor's Complaint, ¶¶ 71-74; Trustee's Complaint, ¶¶ 163-164.

### iii.  The Second Element

This brings us back to the problematic Common Debtor Requirement.  Because the Marshaling Counts fail to satisfy the Common Debtor Requirement in the absence of one or more successful recharacterizations, the Trustee and the Junior Creditor must satisfy an exception to survive the Rule 12(c) Motions.  With all the exceptions, the overarching question becomes whether there is a basis for the court to disregard the separate identities of ServiCom versus Jefferson and Caldwell, and, to treat the Side Collateral pledged to the Senior Creditor by Jefferson and Caldwell as an asset of ServiCom (or JNET and, only then through recharacterization, of ServiCom).

### iv.  An Exception for a Single Economic Unit together with Unfairness or Injustice

The primary exception to the Common Debtor Requirement recognized by courts within the Second Circuit is where the shareholder/guarantor and the corporation were

---

[25]    If the Marshaling Count is successful, the Junior Creditor's secured claim extends only to the portion of the unallocated Auction Proceeds attributed to ServiCom.  *See*, 18-31722 ECF No. 289, p. 9.

alter-egos, or, some fraud or inequitable conduct on the part of the shareholder/guarantor justifies piercing the corporate veil.  To survive the Rule 12(c) Motions as to piercing the corporate veil, the Trustee and the Junior Creditor must plausibly plead facts showing: (1) Jefferson, Caldwell, and ServiCom operated as a single economic entity; and, (2) there was an overall element of injustice or unfairness.  They have not done this.

As noted above, there are several factors a court considers in determining whether two entities operated as a single economic entity.[26]  The Trustee and the Junior Creditor specifically allege three factors[27] including, that ServiCom: (1) was undercapitalized; (2) failed to observe corporate formalities in incurring the Term Note debt; and, (3) was insolvent at the time of the Term Note execution.[28]

### a.  *Undercapitalization*

As to undercapitalization, the question at this stage is not whether ServiCom was undercapitalized but whether it is plausibly pleaded.   "When determining whether a subsidiary was adequately capitalized, courts focus on the initial capitalization."  *In re BH S & B Holdings LLC*, 420 B.R. at 136.  Notably, undercapitalization is rarely sufficient on its own to pierce the corporate veil.  *See*, *In re BH S&B Holdings LLC*, 420 B.R. at 136.  Here, there are no facts alleged regarding ServiCom's initial capitalization.  While there are ample facts about insolvency, as will be discussed next, the brief facts alleged – that the companies were formed in 2003 and Jefferson did not contribute capital – are

---

[26]    Factors include "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *See*, *NetJets Aviation, Inc.*, 537 F.3d at 177.

[27]    There are no facts in either Complaint regarding the remaining factors including: nonpayment of dividends, siphoning off of the corporation's funds by the dominant parent, absence of corporate records, and that the corporation functioned merely as a façade for the operations of the dominant parent.

[28]    There is a logical disconnect between allegations referring to ServiCom's undercapitalization, failure to observe corporate formalities when incurring the Term Note debt, and insolvency at the time of the Term Note execution when the Term Note was executed by, and an obligation of, JNET.

insufficient to state a plausible claim of undercapitalization.  Accordingly, this factor does

not weigh in favor of concluding Jefferson, Caldwell, and ServiCom operated as a single

economic unit.

### b.  *Insolvency*

As to insolvency, I find ample facts in both Complaints that plausibly plead

ServiCom was insolvent for several years leading up to the execution of the Term Note.

*See*, Junior Creditor's Complaint, ¶¶ 39-40, 60, 95-96; Trustee's Complaint, ¶¶ 45-48, 64-

67, 92.  Accordingly, this factor weighs in favor of finding Jefferson, Caldwell, and

ServiCom operated as single economic unit.

### c.  *Lack of Corporate Formality*

The Trustee and the Junior Creditor allege ServiCom failed to observe corporate

formalities in entering into the Term Note.[29]  The relevant allegations include:

- The Term Note was never authorized by ServiCom's Board of Managers as required by the Operating Agreement.
- Despite being a requirement under the terms of the Operating Agreement, upon information and belief, no Board member appointed by Pacesetter was a part of any of these "Board" meetings, and no Pacesetter Board member approved the Term Note.
- Upon information and belief, Jefferson and Caldwell made false representations to Coral regarding ServiCom's solvency to obtain the secured term loan.
- In § 3.10 of the Term Note, ServiCom represented that immediately after receiving $750,000 from Coral, it was solvent. Upon information and belief, this representation was false when made. ServiCom had been insolvent since 2011 at the latest.
- Caldwell even questioned this representation in an email to Jim Bertie ("Bertie") at Coral, on November 18, 2017, stating "I'm not sure we meet [the definition under Sec. 3.10] of solvency."

---

[29]     "In the alter-ego analysis of an LLC, somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required."  *NetJets Aviation, Inc.*, 537 F.3d at 178; *See also*, *In re BH S & B Holdings, LLC*, 420 B.R. at 138 ("the Delaware Limited Liability Company Act (DLLCA) requires little more than that an LLC execute a proper certificate of formation, maintain a registered office in Delaware, have a registered agent for service of process in Delaware, and maintain certain records for membership and tax purposes.").

- Upon information and belief, despite not having obtained Board authorization to enter into the Term Note and intentionally and knowingly misrepresenting the solvency of ServiCom, both Jefferson and Caldwell signed the Term Note.
- Therefore, in accordance with the Operating Agreement, the Term Note was illegally entered into by Jefferson and Caldwell on behalf of ServiCom.
Trustee's Complaint, ¶¶ 13-24, 85-95.

In sum, these allegations add up to a single instance of incurring debt in violation of the Operating Agreement and making false representations to the Senior Creditor. The Trustee and the Junior Creditor have not pointed to persuasive authority – and the court has not independently found any – suggesting one violation of an operating agreement suffices to plausibly plead a failure to observe corporate formalities. Importantly, the Senior Creditor (the recipient of the alleged false representations) is a co-defendant here.

Additionally, the Operating Agreement referred to is JNET's Operating Agreement. Nothing in either Complaint explains why a violation of the JNET Operating Agreement should bear in the analysis of piercing the corporate veil of ServiCom.

I compare these allegations to those in the recently decided *Mammoet Holding B.V.* case, in which District Judge Jesse M. Furman concluded a plaintiff had sufficiently pleaded factors supporting an alter-ego claim between two entities. *Mammoet Holding B.V.,* 481 F.Supp.3d at 229-231. The court noted the complaint plausibly pleaded a lack of corporate formalities in addition to undercapitalization and insolvency, with the plaintiff citing the company's use of a bank account controlled by the other entity, and, the company's executives use of business cards and email addresses bearing the different company's name. *Mammoet Holding B.V.,* 481 F.Supp.3d at 230. The complaint alleged on at least two occasions a chief executive officer of the affiliated company authorized loans on behalf of the company even though he held no position with the company and no authority to act on its behalf. *Mammoet Holding B.V.*, 481 F.Supp.3d at 230. The

court concluded those allegations were sufficient to state a claim that the two business entities operated as a single enterprise. *Mammoet Holding B.V.*, 481 F.Supp.3d at 230-231.

Here, in contrast, the Trustee and the Junior Creditor rely on one example – the execution of the Term Note – to demonstrate a lack of corporate (or LLC) formalities. Given the single example, I find the weight of this factor low.

The purpose of considering these factors as pleaded is to determine whether they sufficiently allege that Jefferson and Caldwell (on the one hand) and ServiCom (on the other hand) acted as a single economic entity. I cannot reach this conclusion. This is not a case where Jefferson and Caldwell used ServiCom as their personal piggy bank. *See, i.e., In re Tampa Chain Co., Inc.*, 53 B.R. at 779 (this "is a case of abuse of corporate funds."). The most plausibly pleaded factor – insolvency – by itself does not warrant piercing the corporate veil. *See, Mason v. Network of Wilmington, Inc.*, 19434-NC, 2005 WL 1653954, at *3 (Del.Ch. July 1, 2005)("mere insolvency is not enough to allow piercing of the corporate veil."). Instead, this is a case where ServiCom appears to have engaged in a legitimate business – providing call center services – separate and apart from Jefferson and Caldwell. *See, In re RSL COM PRIMECALL, Inc.*, 2003 WL 22989669, at *16 (concluding a complaint recognizing that a company operating three business units with separate employees was inconsistent with the contention that the company was a mere shell). As in *RSL COM PRIMECALL, Inc.*, the Plaintiffs' Complaints recognize there was an actual business enterprise here, with hundreds of employees daily administering to the business's obligations under its customer contracts. *See,* Junior Creditor's Complaint, ¶ 21; Trustee's Complaint, ¶¶ 25-29. Here, there are insufficient allegations

that Jefferson, Caldwell, and ServiCom operated as a single economic entity or used the limited liability form to operate a sophisticated shell game.

Because I conclude the Trustee and the Junior Creditor failed to plead facts suggesting ServiCom, Jefferson, and Caldwell acted as a single economic unit, I need not decide if they have plausibly pleaded the second element of piercing the corporate veil (*i.e.*, whether there was an overall element of injustice or unfairness). *See*, *A.V.E.L.A., Inc.*, 241 F.Supp.3d at 475. Even if I reached this element, however, it is not satisfied. The facts in the Complaints are insufficient to support an inference that Jefferson and Caldwell were using ServiCom to "defeat the ends of justice, to perpetrate fraud, or to accomplish a crime, or otherwise to evade the law." *See*, *Bd. Of Trustees of Teamsters Local 863 Pension Fund v. Foodtown*, *Inc.*, 296 F.3d 164, 171 (3d Cir. 2002).

Next, there is a conceptual problem with the Trustee and the Junior Creditor's veil piercing claims because they are attempting to hold non-owners of ServiCom liable for its debts. Neither Jefferson nor Caldwell are holders of the membership interests of ServiCom. The Complaints both seem to ignore the details and structure of the limited liability companies involved in these cases. As noted, ServiCom's membership interests are held by JNET that are, in turn, held by five different entities and individuals. The structure of the limited liability companies is illustrated by the following chart.



According to one court in the Second Circuit, "it is necessary to pierce the corporate veil at each "level or layer" of ownership." *Soroof Trading Dev. Co., Ltd. v. GE Microgen, Inc.*, 283 F.R.D. 142, 151 (S.D.N.Y. 2012)(*citing, In re The Heritage Org., L.L.C.*, 413 B.R. 438, 514 (Bankr.N.D.Tex. 2009)("the Delaware two-pronged test must be applied to, and satisfied at, each level or layer of ownership applicable within the multi-faceted entity structure.")).    However, the law in this respect is far from clear and a controlling Delaware court has not ruled on the issue.    *Compare, Soroof Trading Dev. Co., Ltd. v. GE Microgen, Inc.*, 283 F.R.D. 142 (S.D.N.Y. 2012); with, *In re Moll Industries, Inc.*, 454 B.R. 574, 587 (Bankr.D.Del. 2011)("The Court concludes that it is not necessary for the Committee to make allegations sufficient to pierce every layer of the corporate structure between Moll and HCMLP. There is no indication in the two-part test that it may only be applied to a direct relationship such as a parent and subsidiary. Rather, the test requires that the companies operate as "a single economic entity," tied together by an overall element of injustice.").

The Trustee and the Junior Creditor may have to pierce the corporate veil of ServiCom to reach JNET. Then, to reach the holders of the membership interests of JNET, the corporate veil of JNET may need to be pierced. To ultimately reach Jefferson personally, a third veil – that of Jefferson, LLC – may need to be pierced. At this stage of the proceeding, I need not decide if Delaware law requires piercing at every level of the corporate veil because under either scenario the Complaints fail to allege sufficient facts.

If I were to conclude it is unnecessary to pierce every layer, then for the reasons stated previously, I conclude the Trustee and the Junior Creditor failed to plead facts suggesting ServiCom, Jefferson, and Caldwell acted as a single economic unit.

If I were to conclude it necessary to pierce every layer, the same result is reached because the Complaints fail to contain sufficient facts. The Complaints would need to show reasons to pierce the corporate veil at each level. But here, the only facts provided are that JNET holds 100% of the membership interests of ServiCom and Jefferson holds 100% of the membership interests of Jefferson, LLC. But that is not enough to make it up the chain of limited liability companies. "[C]ourts have recognized that the existence of common directors and officer is a normal business practice ... and that a showing of mere corporate ownership or common management will not be sufficient to justify veil piercing." *In re: Aéropostale, Inc.*, 555 B.R. 369, 419 (Bankr.S.D.N.Y. 2016)(*quoting, Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127, 145 (Bankr.S.D.N.Y. 2016). If 100% ownership was sufficient to pierce the corporate veil or treat the holder of the membership interest as the same as the limited liability company, there would be no purpose in forming single member limited liability companies. As previously noted, to prevail on a claim for piercing the corporate veil, a plaintiff "must show a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness."

47

*NetJets Aviation, Inc.*, 537 F.3d at 176 (internal citations omitted).  Here, each Complaint

fails to plead sufficient mingling of operations between the various limited liability

companies and the holders of their membership interests to permit piercing the corporate

veil.  And, nothing in the Complaints addresses why there is an element of injustice or

unfairness in treating: (1) ServiCom and JNET as separate entities; (2) Jefferson, LLC or

Jefferson as separate entities from each other or from JNET; or (3) Caldwell as a separate

entity from JNET.

In addition to insufficiently pleading facts to pierce the corporate veil on the alter-

ego theory, the Trustee fails to sufficiently allege fraud.[30]  In ¶ 165 of her Complaint, the

Trustee alleges:

> Jefferson and Caldwell, by themselves, and as agents of ServiCom,
> undertook inequitable conduct, overreaching and/or fraud, including, but not
> limited to: (i) entering into the Term Note without proper corporate
> authorization and (ii) making false representations concerning the solvency
> of ServiCom.
> Trustee's Complaint, ¶ 165.

I need not determine whether fraud is a stand-alone exception to the Common Debtor

Requirement or a basis for piercing the corporate veil.  Under either scenario, I must

evaluate whether the Marshaling Counts state enough facts for a plausible claim.  They

do not.  Pleading fraud requires specificity.  Here, the Complaints lack specific information

to plausibly assert fraud.  Additionally, during oral argument Trustee's counsel conceded

her Complaint does not allege fraud.  19-3006 AP-ECF No. 34, at 00:45:40 – 00:45:58.

Turning to another potential exception to the Common Debtor Requirement, I have

considered the Junior Creditor's argument in favor of recognizing the so-called working

---

[30]    "[T]here is no requirement of a showing of fraud when relying on the alter ego theory of liability."  *In
re Sunbeam Corp.*, 284 B.R. 355, 365 (Bankr.S.D.N.Y. 2002).

capital exception utilized by some courts.  The working capital exception was applied by a Florida bankruptcy court in a 1980 case called *Farmers & Merchants Bank v. Gibson*, 7 B.R. 437 (Bankr.N.D.Fla. 1980), *vacated sub nom. Peacock v. Gibson*, 81 B.R. 79 (N.D. Fla. 1981).  In that case, a bank provided a working capital loan secured by a lien on corporate property and guaranteed by a mortgage on residential property of the principal shareholders of the debtor corporation.  The bankruptcy court in *Gibson* found – without much explanation – it would be inequitable to allow the bank to satisfy its lien out of the corporate assets leaving nothing for unsecured creditors of the corporation.  On appeal, the District Court of Florida vacated and remanded the case, concluding the Florida bankruptcy court failed to adequately explain whether: (1) the shareholders exercised personal control over the corporation; (2) the guaranties should be treated as a capital contribution; and, (3) the corporation was thinly capitalized.  *Peacock v. Gibson*, 81 B.R. at 80–81.

I find the reasoning for such an exception under the circumstances here to be unpersuasive for many of the same reasons discussed in *In re United Med. Research, Inc.*, 12 B.R. 941 (Bankr. C.D. Cal. 1981).  In *In re United Med. Research, Inc.*, a California bankruptcy court noted courts should be cautious about applying an exception to the Common Debtor Requirement based on an equity holder's pledge of personal property to secure a loan to a corporate (or here, a limited liability company) entity, because, "[a]dvantageous and proper loans to corporations may be frustrated because shareholders would be fearful of having their personal assets marshaled for corporate creditors should they guarantee a corporate debt."  *In re United Med. Research, Inc.*, 12 B.R. at 943.  I agree adopting a so-called working capital exception to the Common Debtor Requirement could result in a chilling of commercial transactions in some instances.

49

Because there are many instances where struggling companies rely on and may only survive on loans guaranteed by their shareholders, adopting an exception without a showing of fraud, injustice, or other inequitable conduct could unnecessarily be a deterrent to commercial transactions.  As this issue appears to be one of first impression within the Second Circuit, I decline the invitation to recognize such an exception to the Common Debtor Requirement based on the facts alleged in the Complaints.

b.  Recharacterization

In another attempt to satisfy the Common Debtor Requirement, the Trustee and the Junior Creditor seek to recharacterize Jefferson and Caldwell's pledge of the Side Collateral to the Senior Creditor as an equity contribution to ServiCom.  If successful, then the Side Collateral could be viewed as belonging to ServiCom, and the Common Debtor Requirement would be satisfied (*i.e.*, two funds would exist belonging to a common debtor).  Jefferson and Caldwell argue the Term Note loan cannot be recharacterized as an equity contribution because: (1) any recharacterization claim was waived by expiration of the Challenge Deadline in the Cash Collateral Orders; (2) the Term Note is a loan from a third-party, the Senior Creditor; and, (3) the Complaints fail to contain sufficient facts to satisfy the *Autostyle* factors.  For the reasons that follow, I conclude that: (1) the Cash Collateral Orders do not bar the Recharacterization Counts; (2) the Trustee and Junior Creditor have failed to sufficiently plead facts relevant for the applicability of the economic substance doctrine; and, (3) the *AutoStyle* Factors are sufficiently pleaded.

i.  Cash Collateral Orders' Waiver Provisions Do Not Bar Claims

Jefferson and Caldwell assert the Recharacterization Counts seek "to wipe out of existence the loan made by the Senior Creditor," and thus attack the Term Note's validity and enforcement in violation of the Cash Collateral Orders' Waiver Provision.  19-3006

AP-ECF No. 76, p. 36.  Because the Term Note was also secured by a blanket lien on all JNET, ServiCom, and Vitel's assets, Jefferson and Caldwell also assert – without citation, explanation, or, elaboration – the Recharacterization Counts challenge the validity and enforceability of the Senior Creditor's lien on post-petition collateral.  19-3006 AP-ECF No. 76, p. 36.

The Trustee claims the Cash Collateral Orders only protect the Senior Creditor and nothing in her complaint seeks to invalidate or modify any of the Senior Creditor's rights. 19-3006 AP-ECF No. 94.  Rather, it is Jefferson and Caldwell's rights in the funds pledged as Side Collateral that are at issue.  Interestingly, the Senior Creditor is not a defendant on the Recharacterization Counts.  *See*, Trustee's Complaint, p. 21.  The concept that the Trustee is bound by the Cash Collateral Orders is not disputed.

Jefferson and Caldwell appear concerned that a recharacterization of Jefferson and Caldwell's pledge of funds would challenge the validity, enforceability, perfection, or priority of any of the obligations to the Senior Creditor under the Term Note.  But, I am not persuaded.  If the Trustee and Junior Creditor are successful, then Jefferson and Caldwell's pledge of the Side Collateral is recharacterized – as it pertains to them – as an equity contribution to ServiCom.  But, JNET's obligations under the Term Note to the Senior Creditor remain valid, enforceable, and owing.  Additionally, a successful recharacterization claim would not disturb the Senior Creditor's perfection of, or, priority in the Side Collateral.  The Side Collateral would remain as collateral subject to the Senior Creditor's lien for the Term Note.  What would change if the Recharacterization Counts were successful would be the source of the collateral not the fact the Senior Creditor's

lien attaches to it.  I am unpersuaded the Waiver Provisions of the Cash Collateral Orders bar the Recharacterization Counts.[31]

A second issue raised is whether the Cash Collateral Orders' Waiver Provisions bar claims against Jefferson and Caldwell.  Again, I think not.  While I acknowledge Jefferson and Caldwell have important rights, the Waiver Provisions are clearly drafted for the Senior Creditor's protection, and not unnamed third parties.  A driving concern during cash collateral hearings is a debtor's survivability and a "financing creditor usually has substantial leverage" often insisting on a waiver of "defenses or claims based upon the debtor's need to continue the financing relationship."  *In re Hoffinger Industries, Inc.*, 323 B.R. 681, 683 (Bankr.E.D.Ark. 2005).  Here, specifically, the phrase: "[t]he Obligations and the priority of [the Senior Creditor's] security interest and liens on all assets of the Debtors, and all rights … shall be deemed … to be legal, valid, binding, perfected" appears aimed at protecting the Senior Creditor's interest in its collateral, not the individuals' characterizations of the collateral.  18-31722 ECF No. 279, ¶ 10; ECF No. 319, p. 7.  Additionally, a later provision of the Cash Collateral Orders provides, "No rights are intended to be created hereunder for the benefit of any third party or creditor or any direct or indirect incidental beneficiary."  18-31722 ECF No. 279, ¶ 17.  The Cash Collateral Orders do not refer to either Jefferson and Caldwell or, the Term Note's Side Collateral.  Rather interestingly, the Cash Collateral Orders describe the Term Note as being secured by "Pre-Petition Collateral" – a defined term that fails to include the Side

---

[31]     For similar reasons, I am unpersuaded the Marshaling Counts are barred by the Waiver Provisions of the Cash Collateral Orders.  If the Marshaling Counts are successful, the Senior Creditor's perfection and priority is preserved.  Marshaling would only direct the Senior Creditor to apply one source of collateral over another to satisfy its claim pursuant to the Term Note.  Nothing in such an equitable determination voids or eliminates the Senior Creditor's right to either source of collateral.  I am unpersuaded marshaling challenges the Senior Creditor's enforceability rights.  Rather, I find the Marshaling Counts acknowledge and admit the Senior Creditor has enforceable liens against both sources of collateral.

Collateral.  *Compare*, 18-31722 ECF No. 279, ¶ C(c) and ¶ C(a)(iv).  Given the lack of reference to Jefferson, Caldwell, and the Side Collateral, and, after consideration of the language used in the Cash Collateral Orders, I am unpersuaded the circumstances warrant reading the Waiver Provisions expansively to include a waiver of the Recharacterization (or Marshaling) Counts against Jefferson and Caldwell.

ii.   Substance v. Form

Jefferson and Caldwell argue the Recharacterization Counts must fail because the Term Note evidences a loan from a third party – the Senior Creditor – rather than an insider or affiliate of the Debtors.  However, this misconstrues the Recharacterization Counts and they are not seeking to recharacterize the Senior Creditor's loan as equity.  Rather, the Trustee and Junior Creditor seek to recast Jefferson and Caldwell's pledge of funds as security as an equity contribution to ServiCom.  To make this atypical recharacterization claim, the Trustee and the Junior Creditor ask the court to employ several substance-over-form doctrines, including the step-transaction doctrine, the integrated transaction doctrine, the collapsing transactions doctrine, or, the economic substance doctrine.  *See*, 19-3005 AP-ECF No. 39, ¶¶ 14-19; Trustee's Complaint, ¶¶ 135-137, 147, 149, 150-158.  Under all these doctrines, a court considers a transaction's substance, rather than its form.

I find little applicability for the step transaction, the collapsing transactions, or, integrated transactions doctrines to this dispute.  In applying any of these three doctrines, a court condenses multiple transactions, or, steps in a series of formally separate but related transactions, into one.  *See*, *Benenson*, 910 F.3d 690, 701 (2d Cir. 2018)(treating steps as a single transaction if the steps are substantially linked); *See also*, *In re Old CarCo LLC*, 435 B.R. at 185 (collapsing multiple transactions when a series actually

comprises a single integrated transaction).  That is not the situation here.  Based upon the Term Note and the allegations in the Complaints, Jefferson and Caldwell's transfer of funds to the Senior Creditor was not a formally separate transaction.  It was part and parcel with the Term Note transaction itself.  No loan from the Senior Creditor to JNET would be made without the transfer of funds from Jefferson and Caldwell.  There is no need to apply these three doctrines to condense any formally separate "steps" since there was only one.

While I acknowledge the Trustee and Junior Creditor failed to cite authority that the economic substance doctrine applies to recharacterization claims, I am unpersuaded by Jefferson and Caldwell's arguments it is inapplicable.  The fact that the economic substance doctrine stems from tax law precedent is not preclusive.  Notably, the *AutoStyle* factors for analyzing a recharacterization claim – factors that have been widely adopted by courts in the Second Circuit – were formulated in the context of a tax court case.  *See, In re AutoStyle Plastics, Inc.*, 269 F.3d at 750 ("The *Roth Steel* factors were formulated in the context of a tax court case. We believe that the *Roth Steel* factors provide a general framework for assessing recharacterization claims that is also appropriate in the bankruptcy context.")(*citing, Roth Steel Tube Co. v. Comm'r of Internal Rev*enue, 800 F.2d 625 (6th Cir.1986)).

Review of cases applying recharacterization factors and cases applying the economic substance doctrine reveals the concepts possess overlapping principles and themes.  As noted, the *AutoStyle* Factors are intended as a guide to determine whether parties called a transaction one thing when it, in fact, was something else.  *See*, *In re SubMicron Sys. Corp.*, 432 F.3d at 456.  Similarly, the economic substance doctrine provides courts with a second look to "determine whether what was done ... was the thing

which the statute intended." *Bank of New York Mellon Corp. v. C.I.R.*, 801 F.3d at 113 (internal citations omitted).  Both concepts ask the court to look at the substance, rather than the form, of a transaction.

Additionally, both concepts (recharacterization and the economic substance doctrine) seek to avoid allowing individuals and entities to inappropriately benefit based on the form of a transaction.  *See, Bank of New York Mellon Corp. v. C.I.R.*, 801 F.3d at 119 ("a court asks whether the taxpayer has a legitimate, non-tax business purpose for entering into the transaction. [ ] The business purpose inquiry 'concerns the motives of the taxpayer in entering the transaction;' it asks whether the taxpayer's 'sole motivation' for entering a transaction was to realize tax benefits. [ ] The focus is the reasonableness of the transaction[.]")(internal citations omitted); *See also, In re Nilhan Developers, LLC*, 620 B.R. at 416 ("Recharacterization prevents an equity investor from labeling its contribution as a loan and subverting the Bankruptcy Code's critical priority system by guaranteeing itself a higher priority — and a larger recovery — should the debtor file for bankruptcy.).

Here, in essence, the Trustee and the Junior Creditor allege Jefferson and Caldwell should not be able to benefit from a sham transaction where they transferred cash to the Senior Creditor, who then transferred the same cash back to JNET.  The Trustee and the Junior Creditor argue Jefferson and Caldwell should not be allowed to escape the Bankruptcy Code's priority scheme, reduce their personal risk, elevate the debt of the insolvent company, and decrease the assets available for the company's junior creditors.  Jefferson and Caldwell respond arguing this claim if allowed permits a frontal attack on all loans guaranteed by principals of companies.  I disagree.  Based upon the facts alleged in the Complaints, this transaction appears to have atypical characteristics

including: (1) the security was in the form of cash, and, (2) that cash was not held or maintained as security in a separate account, but rather co-mingled with the Senior Creditor's operating funds.  This appears not be the situation where a principal extended a mortgage on his personal assets as security or even pledged cash that was held in a separate account.  Given the circumstances alleged, I find the Trustee and the Junior Creditor are not foreclosed from making such a claim.

However, despite agreeing the economic substance doctrine may apply, there are issues with the Trustee's and Junior Creditor's Recharacterization Counts.

The Trustee's and Junior Creditor's Recharacterization Counts allege:

- ServiCom was insolvent.  19-3005 AP-ECF No. 39,[32] ¶ 4; Trustee's Complaint, ¶¶ 67, 71;

- The Senior Creditor refused to lend money to ServiCom without Jefferson and Caldwell posting the Side Collateral.  19-3005 AP-ECF No. 39, ¶¶ 9, 15; Trustee's Complaint, ¶¶ 146, 155;

- Jefferson and Caldwell transferred cash to the Senior Creditor's general operating bank account, where the cash was comingled with the Senior Creditor's other funds.  19-3005 AP-ECF No. 39, ¶¶ 10, 20(f); Trustee's Complaint, ¶¶ 72, 75, 83, 147;

- The Senior Creditor transferred an amount equal to the amount transferred by Jefferson and Caldwell to ServiCom.  19-3005 AP-ECF No. 39, ¶ 10; Trustee's Complaint, ¶¶ 71, 147.

The Trustee and the Junior Creditor appear to be missing an allegation to complete their economic substance/recharacterization claim.  In the memorandum in opposition to the Rule 12(c) Motion, the Trustee additionally asserts the Senior Creditor "in turn advanced those funds to Debtors for a charge (in the form of interest)" and the Senior

---

[32]    19-3005 AP-ECF No. 39 is the Junior Creditor's Answer, Affirmative Defenses and Counterclaim. Count 1 of the Junior Creditor's Counterclaim is the Recharacterization Count.  See, AP-ECF No. 39, p. 6-11, ¶¶ 1-24.

Creditor "simply funneled the Side Collateral funds to the Debtors for a fee."  19-3006
ECF No. 94, p. 24, 26.  But, these allegations are not in the Complaints.  At most, the
Complaints allege the Senior Creditor "conspired with" Jefferson and Caldwell.  Trustee's
Complaint, ¶ 69; 19-3005 ECF No. 39, p. 6, ¶ 2.[33]  This deficiency is relevant since the
Trustee and the Junior Creditor are asking the court to look at the overall substance of
the transaction and the court's review is limited to the Complaint's allegations.

Another problem with the Recharacterization Counts is the failure to address why
Jefferson and Caldwell's pledge of funds as security for the Senior Creditor's loan to one
company (JNET) should be considered an equity contribution to another company
(ServiCom).  JNET was the maker of the Senior Creditor's Term Note but the
Recharacterization Counts seek to recast Jefferson and Caldwell's pledge as a capital
contribution to ServiCom.  *See*, Trustee's Complaint, ¶ 159; 19-3005 AP-ECF No. 39, p.
11, ¶ 21.  For the reasons explored earlier the Complaints fail to state facts to support a
claim for veil piercing or to disregard the separate identities of JNET and ServiCom.

Due to these problems, the Trustee's and Junior Creditor's Recharacterization
Counts based in part upon the economic substance doctrine, fail to survive the Rule 12(c)
Motion.  This finding of insufficiency is without prejudice to the Trustee's and Junior
Creditor's ability to amend the Complaints since it, "is the usual practice upon granting a
motion to dismiss to allow leave to replead[.]"  *Heckman v. Town of Hempstead*, 568 Fed.
Appx. at 43 (summary order); *See also*, Fed.R.Civ.P. 15(a), Fed.R.Bankr.P. 7015.

---

[33]    The court notes the Junior Creditor's Recharacterization Count only includes the concept that the
Senior Creditor conspired with Jefferon and Caldwell by incorporation of the Trustee's Complaint, ¶ 69.

iii.  Recharacterization and the *AutoStyle* Factors

Putting aside the economic substance doctrine, Jefferson and Caldwell argue the Trustee's and Junior Creditor's Recharacterization Counts fail to sufficiently plead the *AutoStyle* Factors required for a recharacterization claim.  I am unpersuaded the Complaints are insufficient.  Without determining if the Trustee's and Junior Creditor's claims will ultimately be successful, I conclude the Complaints set forth sufficient facts covering a meaningful subset of the *AutoStyle* Factors, permitting the Recharacterization Counts to proceed.

a)  *The names given to the instruments, if any, evidencing the indebtedness.*

The instrument involved in this transaction is named a "Secured Term Note." Jefferson and Caldwell's pledge of funds as security is denoted as Side Collateral.  While I understand the Trustee and Junior Creditor are not seeking to recharacterize the loan portion of the Term Note, it is clear the Term Note evidences the collateral pledge that the Complaints target.  The Trustee and Junior Creditor allege there is no documentation regarding Jefferson and Caldwell's pledge of funds or guaranty.  But, Article 7 of the Term Note plainly addresses Jefferson and Caldwell's pledge and the Side Collateral.  In light of the Term Note's name and the designation of the funds as Side Collateral, the Trustee and Junior Creditor have failed to plead facts showing this factor weighs in favor of recharacterization.

b)  *The presence or absence of a fixed maturity date and schedule of payments.*

While the Term Note contained a maturity date and a schedule of payments, I do not find their presence conclusive.  The maturity date was extended multiple times and payments were not made, but rather, the debt was increased by amendment, with

Jefferson and Caldwell providing additional funds.  Any extension of the maturity date necessarily extends the time the Senior Creditor would be repaid, and in turn, extends the time in which Jefferson and Caldwell would be entitled to a return of funds pledged as security.  If the maturity date was illusory as alleged, then Jefferson and Caldwell could not have anticipated a time for the return of their funds, suggesting an equity investment rather than loan.

c)    *The presence or absence of a fixed rate of interest and interest payments.*

The Term Note includes a rate of interest.  While the Trustee and Junior Creditor argue there was no rate of interest provision for the funds paid by Jefferson and Caldwell, I do not find that persuasive.  They have not provided any authority for a requirement that funds pledged as security include a provision for interest.  The Trustee and Junior Creditor do not plead facts showing this factor weights in favor of recharacterization.

d)    *The source of repayments.*

"If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."  *In re AutoStyle Plastics, Inc.*, 269 F.3d at 751.  Here, the expectation of repayment does not appear to depend solely on the success of the borrower's business.  Both the Trustee and Junior Creditor plead that a source of repayment was the Side Collateral.  Junior Creditor's Complaint, ¶¶ 29-33; Trustee's Complaint, ¶ 158(d).  The Trustee and Junior Creditor have failed to plead facts showing this factor weighs in favor of recharacterization.

e)    *The adequacy or inadequacy of capitalization.*

For purposes of recharacterization of debt to equity, a business's capitalization is not to be assessed only at initial capitalization and may be examined at the time the

transfer was made.  *In re AutoStyle Plastics, Inc*., 269 F.3d at 751.  The Complaints clearly plead insolvency and the lack of capitalization at the time of the Term Note.  As noted, the Complaints are devoid of facts regarding the adequacy of capitalization at the time of formation.  The Trustee and Junior Creditor have pleaded facts slightly weighing in favor of recharacterization.

> *f) The identity of interest between the creditor and the stockholder.*

Under this factor, if the owners of a company make advances in proportion to their respective ownership interests, an equity contribution is indicated, and a "sharply disproportionate ratio between a stockholder's percentage interest in the company and [the amount of the] debt is indicative of *bona fide* debt."  *Eternal Enterprise*, 557 B.R. at 291.  Here, as noted several times, the Trustee and Junior Creditor muddle their allegations by the lack of specificity when discussing the "Debtor" or by defining all debtors as "ServiCom."  While the Complaints allege Jefferson and Caldwell contributed funds as Side Collateral in amounts proportional to their respective interests, the Trustee and Junior Creditor ignore that Jefferson, individually, was not a member of JNET or ServiCom.  Given the lack of clarity, I am unable to determine whether this factor weighs in favor of recharacterization.

> *g)     The security, if any, for the advances.*

Security for a loan is "a strong indication of indebtedness."  *In re BH S&B Holdings LLC*, 420 B.R. at 159.  Here, the Term Note was secured by the Side Collateral and collateral pledged by the Debtors under the Factoring Agreement (*i.e.* a first-priority security interest in all of the Debtors' assets).  *See*, Trustee's Complaint, Ex. B, § 6.1. The Trustee and Junior Creditor argue there was no security to Jefferson and Caldwell

for their pledge of funds, which seems circular.  But, the Complaints do allege Jefferson and Caldwell's funds were transferred to the Senior Creditor and comingled and used as any other funds within the Senior Creditor's operating account.  The commingling of the Side Collateral with the Senior Creditor's operating funds suggests it may not have been "security" for the loan.  All in all, the curious treatment of the funds delivered by Jefferson and Caldwell to the Senior Creditor, as pleaded, does not tip the balance toward or away from recharacterization.

> h)    *The corporation's ability to obtain financing from outside lending institutions.*

"When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans."  *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752. The Trustee and Junior Creditor have pleaded facts suggesting the Debtors could not obtain outside financing.  This factor favors recharacterization.

> i) *The extent to which the advances were subordinated to the claims of outside creditors.*

The whole basis of the Trustee's and Junior Creditor's Recharacterization Counts is that Jefferson and Caldwell conspired to create this transaction so as to avoid risking their personal funds to the Debtors' creditors.  Nothing about the Term Note favored the Debtors' outside creditors other than the fact the loan kept the company afloat.  If the Complaints' allegations are proven as true, the Senior Creditor obtained more collateral at the expenses of other creditors, without any real risk.  Thus, the Complaints plead facts favoring recharacterization.

> j) The extent to which the advances were used to
> acquire capital assets.

The Complaints allege the Term Note proceeds were used to meet operational

cash shortages.   There are no allegations that any capital assets were acquired.   The

Trustee and Junior Creditor have not pleaded facts under this factor supporting

recharacterization.

> k)      The presence or absence of a sinking fund to
> provide repayments.

This factor is irrelevant in this case.

After considering the *Autostyle* Factors in the aggregate, the Trustee and Junior

Creditor have pleaded four factors supporting recharacterization.  If a court is faced with

allegations that address some, but less than all, of the relevant recharacterization factors,

"it might find there to be issues of fact precluding dismissal under Rule 12(b)(6)."  *In re*

*Adelphia Commun. Corp.*, 365 B.R. at 75.  Here, I am required to apply the same standard

for a motion to dismiss to the Rule 12(c) Motions.  Because I conclude that having pleaded

four *Autostyle* factors is a meaningful subset, the Trustee's and Junior Creditor's

Recharacterization Counts should proceed.

## VII.   <u>CONCLUSION</u>

The Trustee and Junior Creditor have an uphill battle before them.   Both the

Marshaling and Recharacterization Counts have deficiencies.  Many of these deficiencies

stem from the Trustee's and Junior Creditor's imprecise use of the term Debtor and lack

of specificity throughout the Complaints.   Given these deficiencies, I conclude Jefferson

and Caldwell's Rule 12(c) Motions should be granted, in part, as it pertains to the

Marshaling Counts, and, the Recharacterization Counts that are based upon the

economic substance doctrine.   The Trustee and Junior Creditor shall be allowed to

replead these claims.[34]  The Rule 12(c) Motions should be denied, in part, as it pertains to the Recharacterization Count based upon the *AutoStyle* Factors.  I have considered all other arguments and find them to be without merit.

ACCORDINGLY, it is hereby

ORDERED: The Motions for Judgment, 19-3005 AP-ECF No. 87 and 19-3006 AP-ECF No. 74, are GRANTED, IN PART, and DENIED, IN PART, as set forth in this Memorandum of Decision; and it is further

ORDERED: The Plaintiffs are granted leave to file amended complaints; and it is further

ORDERED:  A scheduling order will enter after the continued Pre-Trial Conference in the two adversary proceedings scheduled for February 26, 2021, establishing a date by which the Trustee and Junior Creditor may each file any amended complaint.

Dated this 24th day of February, 2021, at New Haven, Connecticut.



Ann M. Nevins
United States Bankruptcy Judge
District of Connecticut

---

[34]    I have considered the four factors relevant to granting amendment pursuant to Fed.R.Civ.P. 15(a) and find they weigh in favor of permitting an amendment of the Complaints.  *See, Clark v. New York City Hous. Auth.*, 20CIV251PAEGWG, 2021 WL 202998, at *1 (S.D.N.Y. Jan. 21, 2021)(Under Rule 15(a), a court must "freely" give leave to amend, Fed.R.Civ.P. 15(a)(2), which normally involves an analysis of the four factors articulated in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962): undue delay, bad faith, futility of amendment, or undue prejudice to the opposing party.).