**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

| | |
|---|---|
| In re:<br><br>SERVICOM, LLC;<br>JNET COMMUNICATIONS, LLC;<br>VITEL COMMUNICATIONS, LLC<br><br>*Debtors* | Chapter 7<br><br>Case No. 18-31722 (AMN)<br>Case No. 18-31723 (AMN)<br>Case No. 18-31724 (AMN)<br>(Jointly Administered Under<br>Case No. 18-31722 (AMN))[1]<br><br>ECF Nos.[2] 507, 562, 646, 647, 1114,<br>1115, 1122, 1125, 1129, 1130, 1205,<br>1232, 1238, 1940 and Proof of Claim 79-3 |
| VFI KR SPE I, LLC,<br>*Plaintiff*<br><br>v.<br><br>EUGENE CALDWELL, DAVID<br>JEFFERSON, and CORAL CAPITAL<br>SOLUTIONS LLC,<br>*Defendants* | Adversary Proceeding No. 19-3005 (AMN)<br><br><br><br><br>AP-ECF Nos. 238, 243, 253, 256, 259,<br>263 |
| BARBARA H. KATZ, CHAPTER 7<br>TRUSTEE,<br>*Plaintiff*<br><br>v.<br><br>EUGENE CALDWELL, DAVID<br>JEFFERSON, and CORAL CAPITAL<br>SOLUTIONS LLC,<br>*Defendants* | Adversary Proceeding No. 19-3006 (AMN)<br><br><br><br><br>AP-ECF Nos. 230, 235, 245, 248, 249,<br>251 |

**MEMORANDUM OF DECISION AND ORDER DETERMINING**
**AMOUNT OF CORAL CAPITAL SOLUTIONS LLC'S**
**PRE-PETITION AND POST-PETITION FACTORING**
**AGREEMENT CLAIMS AND PRE-PETITION TERM LOAN CLAIM**

---

[1] These estates are jointly administered but not substantively consolidated.

[2] A citation to a document filed on the docket of the underlying Chapter 7 case, case number 18-31722, is noted by "ECF No." A citation to a document filed on the docket of an adversary proceeding case is noted by the case number followed by "AP-ECF No."

Table of Contents

**NATURE OF THE PROCEEDINGS** ............................................................................................3

Background and Scope of this Decision ...............................................................................3

Coral's Three Claims...........................................................................................................5

The Importance of the Status of the Side Collateral to the Trustee, VFI and J&C ............................5

**JURISDICTION** ..................................................................................................................6

**APPLICABLE LAW AND BURDEN OF PROOF** ...........................................................................7

  Shifting Burdens of Proof for an Objection to a Proof of Claim .....................................................7

  Standing to Enforce a Note ...........................................................................................8

  Perfection of Security Interests In Cash Collateral and Use ...................................................10

**FINDINGS OF FACT** ..........................................................................................................11

  The Parties and the Pre-Petition Factoring Agreement......................................................11

  The $1,400,000 Note ...................................................................................................12

  The Bankruptcy Estates ..............................................................................................14

  The Post-Petition Factoring Agreement..........................................................................15

  Coral's Accounts & the Post-Petition Transfer of $1.4 Million ...............................................15

  Coral's Changing Story Regarding the $1.4 Million ............................................................16

**DISCUSSION** ...................................................................................................................22

  Coral's First Claim: The Pre-Petition Factoring Agreement ...................................................22

  Coral's Second Claim: The Post-Petition Factoring Agreement...............................................23

  Coral's Third Claim: The $1.4 Million Note .......................................................................23

  1.  Coral Lacked Standing to Enforce the $1.4 Million Note ..................................................23

  2.  Coral Used the Side Collateral .................................................................................25

  a.  The Illusion of Perfection ......................................................................................26

  b.  Coral Used the Entirety of the Side Collateral No Later than December 11, 2018...............28

  3.  Lowest Intermediate Balance Test: Coral Used the Side Collateral Save for a Remaining
  $82,181.42 No Later than December 24, 2018 .................................................................29

  Allegations of Coral's Bad Faith and the Status of the $1.4 Million of Cash Collateral ...............30

**CONCLUSION** ..................................................................................................................31

**RULING AND DECISION** ....................................................................................................32

As any magician knows, the key to a successful illusion is misdirection.  A sleight of hand delights.  But the magician's audience wants to be fooled.

### NATURE OF THE PROCEEDINGS

#### Background and Scope of this Decision

Before filing for bankruptcy on October 19, 2018 (the "Petition Date"), the Debtors[3] in these jointly administered cases operated widespread businesses in the telecommunication sector.  To finance operations and in an attempt to expand their businesses, the Debtors entered into a factoring relationship with Coral Capital Solutions LLC ("Coral") whereby they sold their accounts receivable to Coral.  Despite this financing, the Debtors' businesses became embroiled in a spiral of increasing debt and decreasing liquidity which led the Debtors' principals, David Jefferson and Eugene Caldwell (collectively "J&C"), to enter into a term loan transaction with Coral, to provide additional funding to the Debtors.  ECF No. 2186-24; Exhibit 2099-40.[4]  The Debtors' new loan from Coral in 2017 was in the original principal amount of $750,000, and over several amendments the loan amount increased to $1.4 million (the original Secured Term Note and its amendments are the "Note").  ECF No. 2186-24; Exhibit 2099-40.

The Note required J&C to guarantee the loan and to provide Coral with collateral, in the form of cash, in an amount equal to the amounts Coral would then lend to the Debtors (the cash provided to Coral as collateral is referred to by the parties as the "Side Collateral").  ECF No. 2186-24; Exhibit 2099-40, pp.1-2 (Note, § 2.1).  Although Coral

---

[3] JNET Communications, LLC ("JNET"), Servicom LLC ("Servicom"), and Vitel Communications LLC ("Vitel") are collectively the "Debtors".

[4] ECF No. 2186 is the Clerk's Post-Evidentiary Hearing Witness and Exhibit List.  However, during the Evidentiary Hearings, exhibits were referred to by their original docket number (e.g. 2099-40). Accordingly, the Court includes both designations for clarity.

continued to purchase the Debtors' accounts receivable, the loan pursuant to the Note was a separate financial transaction.

Now, seven years after the Petition Date, the Chapter 7 Trustee, Barbara Katz (the "Trustee"), Coral, creditor VFI KR SPE I, LLC ("VFI"), and J&C remain embroiled in a dispute about the amount of Coral's claims based on the factoring arrangement and the Note. Before the Trustee can complete administration of these estates and before a claim by VFI as a second-position secured creditor can be determined, Coral's claims must be allowed or disallowed.

A central issue to resolving the parties' dispute is the $1.4 million transferred by J&C to Coral's bank as collateral for the Note. The Note provides that J&C's collateral in the form of cash would be required before Coral would make the loan to the Debtors in an equivalent amount. The Note uses the defined term "Side Collateral" for the cash to be paid by J&C. ECF No. 2186-24; Exhibit 2099-40, pp.2, 10. This decision references "Side Collateral" as the parties have used it, but ultimately concludes Coral did not perfect a security interest in the cash and did not hold it as collateral. The terms "cash collateral" and "Side Collateral" in this decision are not interchangeable.

Familiarity with the Court's prior decisions relating to Coral's claims is assumed, including the cash collateral orders entered during the Chapter 11 phase of the bankruptcy cases, a decision precluding evidence of a cash management system as irrelevant to the issues presented here, and a decision disallowing an early termination fee under Coral's pre-petition Factoring Agreement. ECF Nos. 279, 319, 2033, 2162.

<u>Coral's Three Claims</u>

Coral seeks payment from the Debtors' Chapter 7 estates for three claims.  See Proof of Claim No. 79-3 and ECF No. 1940 ("Claim 79-3"); ECF Nos. 507, 562.  First, Coral seeks allowance of a pre-Petition Date claim based on the pre-bankruptcy Factoring Agreement.  This claim is dependent on an early termination fee the Court previously disallowed.  Second, Coral seeks allowance of a post-Petition Date claim based on a post-bankruptcy Factoring Agreement approved by the Court.  This claim is undisputed.  Third, Coral seeks allowance of its claims pursuant to the Note.  Coral asserts it never used or applied the $1.4 million in cash delivered by J&C as collateral.  As a result, Coral continues to also assert entitlement to the principal of $1.4 million plus default rate interest at a rate of 17% per annum, for a claim totaling approximately $2,828,888.65 as of November 2024.  ECF No. 1940-1, p.4.

Although the Trustee, VFI, and J&C oppose Coral's entitlement to the amounts claimed based on various legal theories, all parties agree to the calculations supporting Claim 79-3, *i.e.* the "math," as admitted during various status conferences held in the Fall of 2024,[5] and during the evidentiary hearing held on July 8, 9, and 10, 2025 (the "Evidentiary Hearing").

<u>The Importance of the Status of the Side Collateral to the Trustee, VFI, and J&C</u>

During the period from October 19, 2018 ("Petition Date") through the present, Coral consistently maintained it did not use the $1.4 million of Side Collateral and did not apply any of it to the Debtors' obligations.  Whether Coral ever held or now has cash

---

[5]  The court held nine status conferences between August 21, and December 10, 2024, addressing whether the litigants could agree on the math supporting Coral's claim.  ECF Nos. 1905, 1915, 1931, 1939, 1946, 1956, 1993, 2005, 2009 (scheduling orders).

collateral provided by non-debtors J&C was and remains important to these jointly administered bankruptcy cases for several reasons.

First, this issue bears on the amount the Debtors owe to Coral.  The litigating parties here agree J&C delivered $1.4 million in cash to Coral's bank, Wells Fargo Bank, N.A. ("Wells Fargo") at Coral's instruction prior to the Petition Date.  The Note provided Coral with only two choices regarding the cash from J&C:  It could hold the $1.4 million as collateral, or it could use it after a default by applying some or all of it to the amounts the Debtors owed to Coral.

Second, if Coral decided to hold the $1.4 million of cash as collateral and the Debtors defaulted on the Note, the loan would accrue default rate interest at 17% per annum.  As noted, the Note interest now exceeds the principal, if allowed.

Third, if Coral used (and therefore applied) any of the $1.4 million to the Debtors' debt, then J&C might have a subrogation claim.  If J&C's subrogation claim were to be successful, the Chapter 7 Trustee might establish the loan transaction was in form and substance a capital contribution by J&C to the Debtors rather than a loan, subordinating the J&C claim to claims of other creditors.  Either of these results would materially change the Chapter 7 Trustee's administration of these bankruptcy estates.[6]

### JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this case by virtue of 28 U.S.C. § 1334(b).  This Court derives its authority to hear and determine this matter on reference from the District Court for the District of Connecticut

---

[6] The Court has not heard evidence on subrogation, subordination or recharacterization claims at this time.

pursuant to 28 U.S.C. §§ 157(a), (b)(1), and the District Court's General Order of Reference dated September 21, 1984. This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(A) (administration of the estate), (B) (allowance of claims), (C) (counterclaims), and (K) (determining validity, extent, or priority of liens). This Memorandum of Decision and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, applicable in this proceeding pursuant to Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure.

To the extent the claims asserted in adversary proceeding cases 19-3005 and 19-3006 are related to *Stern* claims, Coral, VFI, J&C, and the Trustee have each expressly consented to entry of final judgments by this Court pursuant to Fed.R.Bankr.P. 7008 and 7012(b). Case No. 19-03005: AP-ECF Nos. 54 (Coral); 55 (VFI); 57 (J&C); Case No. 19-03006 AP-ECF Nos. 47 (Trustee); 48 (Coral); 49 (J&C). See *Stern v. Marshall*, 564 U.S. 462 (2011); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 686 (2015) (holding that parties may consent to entry of a final order by bankruptcy courts notwithstanding the holding in *Stern*); see also 28 U.S.C. § 157.

## APPLICABLE LAW AND BURDEN OF PROOF

### Shifting Burdens of Proof for an Objection to a Proof of Claim

Courts within this circuit employ a burden-shifting methodology in which a proof of claim is prima facie evidence of the validity and amount of a claim, and the objector bears the initial burden of persuasion. See *In re Cocoa Servs., L.L.C.*, No. 17-11936-JLG, 2018 Bankr. LEXIS 1132, 2018 WL 1801240, at *16 (Bankr. S.D.N.Y. Apr. 13, 2018); *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009). Bankruptcy Rule 3001(f) provides that "a proof of claim executed and filed in accordance with these rules shall constitute prima facie

evidence of the validity and amount of the claim." Fed.R.Bankr.P. 3001(f).  To overcome the prima facie validity of the claim, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim.  By producing evidence equal in force to the prima facie case, an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant.  At that point, the claimant must prove by a preponderance of the evidence that under applicable law the claim should be allowed.

<u>Standing to Enforce a Note</u>

The Note here is governed by New York law.  As with most states, New York has adopted the Uniform Commercial Code.  Under Uniform Commercial Code § 3-301, the right to enforce a negotiable instrument is generally limited to the "holder" of the instrument or a "non-holder in possession of the instrument who has the rights of a holder." *Bank of New York Mellon v. Deane*, 41 Misc.3d 494, 499 (2013); U.C.C. § 3-301.  A "holder" is defined as the person in possession of a negotiable instrument that is payable either to the bearer or to an identified person who is the person in possession.  N.Y. U.C.C. Law § 1-201(b)(21).  This definition underscores the necessity of physical possession of a note to establish standing to enforce it.  *Bank of America, N.A. v. Sebrow*, 180 A.D.3d 982 (App. Div. 2nd. Dept. 2020).

Recent case law confirms possession of an original note is a critical element of enforcement.  For example, a New York appellate court held in *Sebrow* that a plaintiff must demonstrate physical possession of an original note at the time of the commencement of the action to establish standing as a holder.  *Sebrow*, 180 A.D.3d at 985.  Similarly, in *US Bank as Trustee v. Cadeumag*, a New York trial court emphasized a plaintiff must show physical delivery of a note, either endorsed to it or endorsed in blank,

to have standing to enforce the instrument. *US Bank v. Cadeumag*, 196 N.Y.S.3d 862 (Sup. Ct. 2023); see also *OneWest Bank, N.A. v. FMCDH Realty, Inc.*, 165 A.D.3d 128, 131 (App. Div. 2nd. Dept. 2018) ("Where the note has been indorsed in blank, the holder must establish its standing by demonstrating that the original note was physically in its possession at the time of the commencement of the action").  See also, *In re Benyamin*, 596 B.R. 789, 796 (Bankr. S.D.N.Y. 2019) (holding failure to prove holder status via actual or constructive possession of a note, as of the petition date, extinguished the creditor's claim).

New York courts consistently hold the absence of possession disqualifies a party from enforcing a note.  See generally, *Nationstar Mtge., LLC v. Danzig*, 173 A.D.3d 883, 884 (App. Div. 2nd. Dept. 2019); *Bank of N.Y. Mellon v. Gordon*, 171 A.D.3d 197, 203 (App. Div. 2nd. Dept. 2019); *Nationstar Mtge., LLC v. Medley*, 168 A.D.3d 959, 961 (App. Div. 2nd. Dept. 2019); *U.S. Bank NA v. Brody*, 156 A.D.3d 839 (App. Div. 2nd. Dept. 2017); *OneWest Bank, N.A. v. FMCDH Realty, Inc.*, 165 A.D.3d at 131; *Cadeumag*, 196 N.Y.S.3d 862 (Sup. Ct. 2023); *Bank of New York Mellon v. Deane*, 970 N.Y.S.2d 427 (Sup. Ct. 2013).

Under N.Y. U.C.C. Article 3, an exception allows a person not in possession of a negotiable instrument to enforce it if the instrument has been lost, destroyed, or stolen. N.Y. U.C.C. § 3-804.  However, here the Note is not "lost."

Coral's obligation to establish it has standing cannot be waived.  "[F]ederal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)); see also, *Stagg, P.C. v. United States Dept. of State*, 983 F.3d 589, 601 (2d Cir. 2020) (courts must

determine standing "even though the parties are prepared to concede it."); *Together Dev. Corp. v. Pappas (In re Together Dev. Corp.)*, 262 B.R. 586, 588-89 (Bankr. D. Mass 2001) ("[O]bjections to a party's standing in a given case cannot be waived").

<u>Perfection of Security Interests In Cash Collateral and Use</u>

The Court's prior discussion of the concepts of "Use," "Commingling," and "Application" under N.Y. U.C.C. § 9-207 and the "Lowest Intermediate Balance Test," set forth at length in ECF No. 2033, pp. 3-7, are incorporated here.

While N.Y. U.C.C. § 9-205(a) validates the concept of a "floating lien" and allows the use, commingling, and disposal of collateral without invalidating a security interest in some circumstances, it does not eliminate the requirement for possession or control when the collateral is cash. Pursuant to N.Y. U.C.C. § 9-203(b), a security interest in cash collateral is enforceable only if the creditor has possession and control of that cash collateral. N.Y. U.C.C. § 9-203(b)(3)(B). Even though commingling alone may not render the collateral unidentifiable, once cash collateral is spent, it ceases to be "identifiable proceeds," which is a necessary condition for a security interest to continue in cash proceeds under N.Y. U.C.C. § 9-315(a)(2). For example, in *Ford Motor Credit Co. v. State*, the court held cash paid to satisfy a sales tax liability could not constitute "identifiable cash proceeds" subject to a creditor's security interest. *Ford Motor Credit Co. v. State*, 219 A.D.2d 202 (App. Div. 3rd. Dept. 1996); see also, *Cibro Petroleum Products Inc. v. Fowler Finishing Co., Inc.*, 400 N.Y.S.2d 322 (Sup. Ct. 1977) (a creditor's security interest is enforceable where the funds in an account are subject to withdrawal by the creditor alone and held as security for the debtor's obligations).

## **FINDINGS OF FACT**

In addition to the facts already described, the Court makes the findings of fact in the following numbered paragraphs, and in the discussion that follows.

### The Parties and the Pre-Petition Factoring Agreement

1. On October 17, 2011, Coral Capital Solutions LLC entered into a Factoring Agreement with the Debtors (the "Factoring Agreement").  ECF No. 2186-23; Exhibit 2099-39.

2. The Debtors and Coral amended the Factoring Agreement twelve times before the filing of these jointly administered bankruptcy cases on October 19, 2018 ("Petition Date").

3. Pursuant to the Factoring Agreement, the Debtors sold millions of dollars of accounts receivable to Coral each month.  Coral, the Trustee, J&C, and VFI agree Coral's outstanding pre-Petition Date advances to the Debtors, pursuant to the Factoring Agreement, totaled $6,737,858.76.  They also agree Coral later collected $8,001,419.41 on account of these purchased accounts receivable, resulting in a surplus or "over collection" of $1,263,560.65.  Coral asserts and the Trustee, VFI, and J&C have not disputed Coral is entitled to factoring fees as a result of these collections totaling $240,194.85.

4. Under the pre-Petition Date Factoring Agreement, accounting for the factoring fees, Coral over collected approximately $1,023,365.80.  ECF No. 1940, Exhibit A.

5. The Court recently denied Coral's request for allowance of an Early Termination Fee, allegedly owed pursuant to the Factoring Agreement.  ECF No. 2162.

### The $1,400,000 Note

6.  On November 21, 2017, JNET and Coral entered into the Note in the original principal amount of $750,000 (as amended from time to time) and through amendments the amount increased to $1.4 million.  ECF No. 2186-24; Exhibit 2099-40.

7.  The Note was executed by J&C, JNET, Vitel, and Servicom.

8.  Article 7 of the Note provides:

    [Jefferson and Caldwell] each hereby (i) agrees to deliver to [Coral] the Side Collateral from time to time, (ii) grants in favor of [Coral] a first priority lien on security interest in, and right of set-off against, the Side Collateral to secure all Obligations of the [Debtors] to [Coral] under the Note, (iii) to the extent of the Side Collateral, unconditionally and irrevocably guaranties to [Coral] the full and prompt payment of all amounts due and payable under this Note, and (iv) agrees that, upon an Event of Default, [Coral] may use the Side Collateral (with or without any notice) to satisfy any and all Obligations of the [Debtors] under this Note.
    ECF No. 2186-24; Exhibit 2099-40, p. 10.

9.  Coral disbursed $1.4 million to JNET between November 22, 2017, and June 29, 2018, pursuant to the Note.

10. Section 5.2 of the Note provided the Obligations under the Note would be secured by all Collateral pledged pursuant to the pre-Petition Date Factoring Agreement as well as the Side Collateral pledged under the Note.

11. Four bank accounts are relevant to this decision: (1) Coral's revolving secured working capital loan facility ledger account with Wells Fargo (the "Loan Account"); (2) Coral's master operating depository account at Wells Fargo (the "Operating Account"); (3) Coral's depository account at First Republic Bank (the "FRB Account"); and (4) a cash collateral account controlled by Wells Fargo (the "Collateral Account").

12. Notably, the Loan Account is not a depository account (and so does not hold cash) and Coral did not own or control either the Loan Account or the Collateral Account.

13. During the Evidentiary Hearing, Coral's President, Einat Steklov-Hahn ("Ms. Steklov") testified J&C wire transferred funds to be held as cash collateral directly to an account Wells Fargo designated to receive it. ECF No. 2156, pp. 86-87, 90. Wells Fargo then, "applied the money that came in, into [the Loan Account], created availability on [the Loan Account], and then moved it out to [the Collateral Account] that we had no access to." ECF No. 2156, p. 90.

14. This process was followed after each wire transfer from J&C. Each time there was an increase in Coral's loan availability on the Loan Account, followed by a decrease in availability when funds were moved to the Collateral Account. ECF No. 2156, pp. 93-98, 155-157; see also, e.g. ECF Nos. 2186-10, 2186-13, 2186-16, 2186-19, 2186-22; Exhibits 2099-26, 2099-29, 2099-32, 2099-35, 2099-38.

15. Coral's Chief Operating Officer, James Bertie ("Mr. Bertie"), testified he transferred possession of the original Note (including each amendment) to Wells Fargo prior to the Petition Date. ECF No. 2158, pp. 142-143.

16. Coral did not possess the original Note at any time from the Petition Date through the Evidentiary Hearing.

17. Mr. Bertie testified that although Coral requested the return of the Note, Wells Fargo refused because Mr. Bertie told Wells Fargo the Note was not yet paid. ECF No. 2158, pp. 142-143, 160, 226-227; ECF No. 2159, pp. 28-29.

18. The record does not include evidence of an agreement between Wells Fargo and the Debtors, or an agreement between Wells Fargo and J&C relating to the Note or Side Collateral.

19. Although the Note described the $1.4 million of cash transferred by J&C as collateral, Coral never held the cash transferred from J&C in a deposit account owned and controlled by Coral.  ECF No. 2156, pp. 86-87, 90; see also, e.g., ECF No. 2186-9; Exhibit 2099-25.

<u>The Bankruptcy Estates</u>

20. After the October 19, 2018, Petition Date, the Debtors operated their businesses as Chapter 11 debtors and debtors in possession.  The Court converted the cases to Chapter 7 cases on January 16, 2019, and they remain jointly administered by a Chapter 7 Trustee.  ECF No. 394.  The cases are not substantively consolidated.

21. The Debtors ceased operations in December 2018 and liquidated certain contracts. The Chapter 7 Trustee recovered additional funds through litigation.

22. The Chapter 7 Trustee is holding $1,985,144.85 (as of July 7, 2025).  ECF No. 2144.

23. Of the $1,985,144.85, Coral alleges $1,417,612.08 is subject to Coral's pre-petition and post-petition security interest.  VFI holds a pre-petition lien against the same $1,417,612.08 which would only be paid after Coral's claim is satisfied.

24. In this case, allowed Chapter 11 administrative expenses would be paid after Chapter 7 administrative expenses.  11 U.S.C. §§ 503, 507.

25.  The Trustee estimates there are Chapter 7 administrative fees and expenses totaling approximately $1,700,000, pursuant to 11 U.S.C. §§ 507, 726.  ECF No. 2144. Allowed Chapter 7 administrative fees and expenses are generally payable from unencumbered estate funds.

<u>The Post-Petition Factoring Agreement</u>

26. After the Petition Date, and prior to the Debtors' liquidation and conversion, the Debtors were authorized to sell accounts receivable to Coral under a Post-Petition Factoring Agreement approved via several interim cash collateral orders.  ECF Nos. 52, 104, 154, 214, 279, 319.  Coral was granted a security interest in "Postpetition Collateral" as defined in the cash collateral orders which includes a portion of the funds now held by the Chapter 7 Trustee, and a Chapter 11 administrative claim.

<u>Coral's Accounts & the Post-Petition Transfer of $1.4 Million</u>

27. Both Ms. Steklov and Mr. Bertie testified that on December 10, 2018, they called Wells Fargo to request it transfer $1.4 million from the Collateral Account to an account Coral controlled.

28. Upon direction from Mr. Bertie, on and after December 11, 2018, Coral initiated and completed several transactions, including the following:

    a. At Mr. Bertie's request, Wells Fargo transferred $1.4 million from the Collateral Account to Coral's Loan Account, thereby increasing Coral's loan availability and resulting in a credit balance.

    b. Coral transferred approximately $1.7 million from Coral's Loan Account into Coral's Operating Account.

    c. Coral transferred approximately $1.5 million from Coral's Operating Account to Coral's FRB Account.

    d. Coral completed approximately $1.5 million in payments from its FRB Account, including distributions to certain participants in Coral's business operations.
    ECF No. 2156, pp. 116-117; 121-124; ECF No. 2186-22; Exhibit 2099-38.

29. Beginning in December 2018, Coral maintained a liability on its books for $1.4 million under an entry labeled "Side Collateral."  Nothing identified the "Side Collateral" as relating to the Note, the Debtors, or J&C.

30. The Trustee, Coral, VFI, and J&C each agree Coral had direct possession and control of no more than $82,181.42 in cash across all of its deposit accounts at financial institutions or in any other place on December 24, 2018.

31. Coral eventually admitted this figure was the lowest aggregate cash balance for all of Coral's deposit accounts from December 10, 2018, through the Evidentiary Hearing. ECF No. 1967, p. 4; ECF No. 2019, pp. 13, 16; ECF No. 2159, p. 6.

32. From the Petition Date through the Evidentiary Hearing, Coral consistently maintained it has not used or applied any of the Side Collateral.

33. In June 2019, the Trustee and VFI each filed adversary proceeding complaints based in part on marshaling theories, seeking to compel Coral to apply the Side Collateral to satisfy the Note.  See Adv. Case Nos. 19-03005 and 19-03006.

<u>Coral's Changing Story Regarding the $1.4 Million</u>

34. James Bertie testified in his May 8, 2019, deposition:[7]

> **Q**. On the million four.  Where is the million four physically?  Is it in a bank account?
> **A**. It is in a bank account.
> **Q**. At what bank?
> **A**. I am not sure where we have it currently.  It is with Coral.
> …
> **Q**. What does that mean, it is with Coral?
> **A**. It has to be in a bank account somewhere.  I don't know what account it is in, but we have it.

35. During a hearing on April 25, 2019, Coral's attorney stated, "the loan documents clearly don't provide for [Coral to take the collateral] and we have business reasons for not taking it right now… there are still outstanding receivables out there and

---

[7] This testimony was admitted as impeachment testimony during the evidentiary hearing.  ECF No. 2158 pp. 201-205.

these guarantors [J&C] are actually diligently working to help us collect those receivables….."  ECF No. 622, 4/25/2019 Hearing, 00:21:04 to 00:21:22.[8] The attorney confirmed to the Court Coral had not used the $1.4 million of cash collateral and that it remained unapplied.

36.    During a hearing held on August 27, 2019, in response to a direct question from the Court, Coral's attorney stated the $1.4 million Side Collateral was, "in a segregated account and it is not accruing interest."  ECF No. 2044, p. 35. However, two of Coral's attorneys immediately hedged, indicating they would confirm the information with Coral. *Id*.

37.    Also on August 27, 2019, an attorney for Coral represented to the Court, "Your Honor, one thing's for certain is that these funds will not be returned to Jefferson and Caldwell without notice to all of the interested parties and I suspect that that's not going to happen at all until resolution of the lawsuit.  But, certainly, we will not make a disbursement without advising everybody."  ECF No. 2044, p. 36.  The clear implication of the hearing statements was that Coral held the $1.4 million of cash as collateral, in a bank account.

38.    Two years later, on September 23, 2021, during a hearing about whether discovery sought from Wells Fargo should be compelled over Coral's objection – once it was clear the cash collateral had not actually been segregated in 2019 and was not then segregated – the Court asked Attorney Lazarus about Coral's bank account: "[Did] you [provide] all the intervening account statements showing whether the

---

[8] All timestamps indicate the hours:minutes:seconds (00:00:00) for the .mp3 file publicly available at the referenced ECF No. as an attachment.

account dropped below $1.4 million at any time?"   ECF No. 1179, 9/23/2021

Hearing, 00:50:46 to 00:50:53.[9]

39.   Attorney Lazarus representing Coral stated, "[t]he answer is we showed one

statement, and I believe the actual ledger card [from Wells Fargo] shows it came

in on day one and it didn't leave until day two.  So, it's not a question.  It was always

there until it wasn't."  ECF No. 1179, 9/23/2021 Hearing, 00:50:53 to 00:51:12.

40.   The next day, on September 24, 2021, Counsel for VFI reported Coral would

stipulate that upon receipt of the $1.4 million, it was consumed in Coral's day-to-

day operations or payroll or for other purposes.  And Coral would waive any

argument with respect to LIFO or FIFO accounting principles (last in, first out or

first in, first out).  And Coral agreed to admit that the money came in and the money

left.  Attorney Welford, representing VFI, concluded, "And, we don't have to trace

it; the money does not exist."   ECF No. 1181, 9/24/2021 Hearing, 00:09:10 to

00:09:48.

41.   Attorney Lazarus, representing Coral, did not agree, however, and responded,

"What I will stipulate to is that once the $1.4 million went into the Operating

Account, there were no entries made anywhere in the financial books and records

of Coral that reflected that any given expenditure out of the Operating Account was

an expenditure related to the $1.4 million that came in.  That is what I am willing to

stipulate to.  Period." ECF No. 1181, 9/24/2021 Hearing, 00:10:33 to 00:11:15.  He

continued, "[the cash] completely lost its identity and was used as any other funds

---

[9] Although Fed.R.Bankr.P. 9011(d) provides subsection (b) does not apply in the context of discovery, Fed.R.Civ.P. 26(g), applicable here through Fed.R.Bankr.P. 7026 imposes virtually identical obligations on counsel.

in the account were used." ECF No. 1181, 9/24/2021 Hearing, 00:14:43 to 00:14:50.

42. On October 25, 2021, Coral's attorneys filed a written opposition to VFI's motion to compel discovery from Wells Fargo, representing the following records related to the time period between December 2018 and Mr. Bertie's testimony in Spring 2019 were sufficient and had been produced:

> f. Banking records showing that on December 11, 2018, funds were transferred to Coral's Master Operating Account at Wells Fargo totaling $1,700,000.00, which included the $1.4 million of Side Collateral; and
>
> g. Banking records showing the $1.4 million [S]ide [C]ollateral in Coral's bank account on May 21, 2019."
> ECF No. 1226, p. 4 (internal document references omitted).

43. Coral also represented in October 2021, "[a]s the Court is aware, the $1.4 million [S]ide [C]ollateral, was deposited and held [in the Collateral Account] between November 22, 2017, and December 10, 2018. Thereafter, on December 11, 2018, the [S]ide [C]ollateral was transferred and commingled into Coral's [Operating Account]." ECF No. 1226, p. 4.

44. On June 15, 2022, Coral argued in support of its motion for summary judgment: "Coral maintains a liability on its books for the full amount of the [S]ide [C]ollateral and further maintains funds or access to funds sufficient to repay the [S]ide [C]ollateral, if called to do so." ECF No. 1422, p. 13. Coral also argued, "because the Side Collateral is money, and money is fungible, Coral was permitted under Section 9-207(b)(3) to comingle it with Coral's other funds," and further, "Coral has never, at any time since receiving any portion of the Side Collateral, been unable to repay the Side Collateral. Indeed, it was at all times accounted for as a liability

on Coral's books and Coral always had the funds, or an equivalent availability on its line of credit, available to repay it." ECF No. 1422, pp. 36-37.

45.   In June 2022, Coral admitted, "on or about December 10, 2018, Coral requested that Wells Fargo transfer $1.4 million of the Side Collateral to [the FRB Account]. Wells Fargo advised that the easiest way to effectuate that transaction was to transfer the funds from [the Collateral Account] into [the Loan Account], which would effectively decrease the balance of the Loan. Coral could then draw an amount [from the Loan Account] for further transfer to [the FRB Account]." ECF 1422, p. 40.

46.   On September 2, 2022, Coral's response to VFI's motion for summary judgment argued: "Coral properly had possession of the Side Collateral pursuant to the Secured Term Note and permissibly commingled those funds with Coral's other funds pursuant to UCC Section 9-207(b)(3)." ECF No. 1553, p. 13.

47.   The response also appears to directly adopt and bolster Mr. Bertie's May 2019 testimony, declaring it to be truthful. Coral's counsel wrote: "Mr. Bertie testified that Coral had not pursued the Side Collateral at the time of his May 8, 2019 deposition and testified that he did not know precisely where the money was being held. That is both truthful and unremarkable, given that the Side Collateral was fungible cash that had been commingled with Coral's other fungible cash, as the UCC allows Coral to do." ECF No. 1553, p. 42.

48.   Coral's response further argued: "Coral never used the Side Collateral, at all." ECF No. 1557, p. 6. The same pleading acknowledged, "[e]ach time Jefferson and Caldwell provided Side Collateral to Coral, the funds were first deposited into [the Loan Account], which reduced Coral's Loan balance, and then immediately

transferred to the [Collateral Account], which increased Coral's Loan balance."

ECF No. 1557, p. 9.

49.    On September 30, 2024 – five years after Coral told the Court the Side Collateral

was in a segregated account, and three years after Coral's counsel had disclosed

that on December 11, 2018, $1,400,000 had been transferred and commingled

into Coral's Operating Account – there was this exchange between the Court and

Coral's counsel:

THE COURT:  ... is there an account that Coral controls that had a million four at
all times?

MR. KANE: We're still working with the client to collect all of those bank statements
and to look at all those accounts.  And there are capital accounts with Coral that
have cash, as well, and so cash meaning -- excuse me -- balances, not physical
cash. Yeah, so we understand we have to assemble that information in order to
prove-up our legal theory, but we're still in the process of doing that."
ECF No. 1935, p. 35.

50.    On December 4, 2024, the Court asked Coral: "Were there only three bank

accounts in December 2018, in the name of Coral Capital Solutions LLC?"

Attorney Hedges responded for Coral: "We're not here today to represent to you

that we understand the whole universe of bank accounts that Coral may have had.

But those are the three accounts that we are using to support our claim."  ECF No.

2018, pp. 87-88.

51.    On December 4, 2024, Coral's attorneys indicated they thought the Court, "raised

an interesting issue today about cash management process.  We think, like

everything else on this issue, it's not totally on all fours, but we have -- we [have

looked at the law] there and we think it's worth considering."  ECF No. 2018, pp.

87-88.  Indicating Coral would file a supplemental brief, he continued, "The judge

has been talking about the relationship of Coral's cash management.  There's

actually a body of law dealing with the cash management process; again, it's analogous to the facts here and we think it's worth, it's very much worth considering."  ECF No. 2018, pp. 87-88.

52.    Having not filed the promised supplemental memorandum of law supporting Coral's cash management theory, on December 10, 2025, Coral's attorney noted, "[w]e're going to stand on our papers.  … We took a look [at the body of law dealing with the cash management process] and I think it will just confuse things more and it's not as analogous as we thought."  ECF No. 2019, p. 10.

## **DISCUSSION**

This decision addresses whether and to what extent Coral's three separate claims will be allowed.  See ECF No. 1940, Exhibit A.

In addition, one or more other litigants here argue Coral's conduct during this litigation merits a sanction.  ECF Nos. 2135, pp. 40-42; 2136, pp. 17-18.  The argument centers around testimony by one or more of Coral's representatives and one or more of Coral's attorneys' representations to the Court in hearings and documents filed in these cases as to the status of $1.4 million of cash supposedly held as collateral.

This decision addresses each of these in turn.

### Coral's First Claim: The Pre-Petition Factoring Agreement

Coral is not entitled to an "Early Termination Fee" pursuant to the Pre-Petition Date Factoring Agreement, as stated in ECF No. 2162.  Based on the "math," which is agreed by all, Coral's claim based on the pre-Petition Date Factoring Agreement is disallowed, and Coral *owes* the bankruptcy estates approximately $1,023,365.80 on this portion of Claim 79-3, representing overcollection of accounts receivable.  See ECF No. 1940, Exhibit A.  No attorney's fees or costs are allowed on this first claim.

<u>Coral's Second Claim: The Post-Petition Factoring Agreement</u>

The Court concludes Coral is allowed a Chapter 11 secured claim and administrative expense claim pursuant to 11 U.S.C. § 503(b) in the amount of $205,453.01, arising from post-petition factoring services provided pursuant to various orders entered during the Chapter 11 phase of the case.  ECF Nos. 279; 319; see ECF No. 1940, Exhibit A, p. 6.  No attorney's fees or costs are allowed allowed on this second claim because Coral's entitlement to this portion of Proof of Claim 79-3 was not challenged.

<u>Coral's Third Claim: The $1.4 Million Note</u>

The first two portions of Coral's claims relating to the Pre-Petition and Post-Petition Factoring Agreements are relatively straightforward.  The core dispute centers on the claim asserted under the Note, and the status of the alleged cash collateral.

*1. <u>Coral Lacked Standing to Enforce the $1.4 Million Note</u>*

The assumption that Coral has the right to enforce the Note is a persistent illusion in this litigation.  Although Coral and J&C argue Coral's standing to enforce the Note cannot be challenged by VFI or the Trustee because of certain waiver provisions in this Court's various Cash Collateral Orders during the Chapter 11 phase of these cases, the Court rejected this argument on several occasions, and upon multiple bases.  See, e.g., ECF Nos. 1910, pp. 7-8; 1913, pp. 3-4.  Coral's obligation to establish its standing to enforce the Note in this Court cannot be waived because federal courts must determine standing even if the parties are prepared to concede it.

Here, Coral failed to meet its burden of proof to establish it has or had standing to enforce the Note at any relevant time.  To enforce a note under New York law, a creditor must have possession of the original document.  New York courts consistently hold the

absence of possession disqualifies a party from enforcing a note.  Coral's evidence proved that Coral did not possess the Note and therefore had no authority to enforce it at any time relevant to this litigation.

Coral did not possess the original Note on the Petition Date, the date it filed Proof of Claim 79-3, or the date it filed the Motion to Disburse (ECF No. 507).  No evidence of possession was presented at the Evidentiary Hearing to establish Coral's standing to enforce the Note.  Rather, Coral's representatives testified they were unable to retrieve the original Note from Wells Fargo, despite attempts to do so.  The record is clear the Note was not lost, and so the absence of the original is not excused by the provisions of N.Y. U.C.C. § 3-804.

While Coral spent much of its post-trial argument asserting *Wells Fargo* could not have enforced the Note, the critical inquiry is whether *Coral* could enforce it.  Coral's post-trial possession of the original Note does not remedy its lack of standing from the Petition Date through trial.  While there may be some ambiguity regarding when exactly a creditor needs to possess a note in order to assert and enforce its claim[10] the distinction does not matter because Coral did not possess the Note on any relevant date.  See generally N.Y. U.C.C. §§ 9-203, 9-205.  Courts are generally reluctant to reopen a trial record after the close of evidence unless the moving party can show a compelling justification.  Although the decision is left to the Court's discretion, some factors that are commonly considered are:

> The timeliness of any motion to re-open evidence,
> The character and probative value of the proposed evidence,
> The reason for the moving party's failure to introduce the evidence earlier,

---

[10] An argument could be made the critical date was the Petition Date, the date Coral filed its proof of claim, or the date Coral filed its Motion to Disburse.

Any potential prejudice to the opposing party, and
The overall interests of justice
*John v. Sotheby's, Inc., 858 F. Sup. 1283, 1288 (S.D.N.Y. 1994).*

Although no motion to re-open the evidence was filed, the post-trial affidavit would certainly prejudice all other parties, and lacks relevance since the critical inquiry is whether Coral possessed the Note at the time it initiated collection, whether that is measured from the Petition Date, the date when Coral filed Proof of Claim 79-3, or when Coral filed the Motion to Disburse.

In addition to lacking possession of the Note at any relevant time, Coral also did not present evidence leading to a conclusion it was authorized by Wells Fargo to enforce the Note while the original was in Wells Fargo's possession. Based upon this record, there is no basis to conclude Coral may enforce the Note without possession.

On these facts, the Court concludes Coral's claim as to the Note is unenforceable under New York law, and also under Bankruptcy Code § 502(b)(1) because Coral lacked standing to enforce it at any relevant time. 11 U.S.C. § 502(b)(1) (claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured).

  2. *Coral Used the Side Collateral*

Even if the Court's determination that Coral lacked standing to enforce the Note is in error, the Note is also unenforceable against the Debtors' bankruptcy estates because Coral used or applied the $1.4 million of cash delivered by J&C to Wells Fargo. Although, under the terms of the Note, Coral could use and commingle the cash collateral the Evidentiary Hearing highlighted that Coral did not treat the $1.4 million as collateral.

a. *The Illusion of Perfection*

Coral and J&C implemented the Secured Term Note transactions through a series of pre-petition cash transfers that prioritized convenience over compliance with the perfection requirements of the U.C.C.  These sloppy transfers contributed to the illusion Coral had segregated the $1.4 million in cash transferred by J&C, or that, at a minimum, Coral held $1.4 million in cash at all times across accounts it owned and controlled. Instead of entering into a collateral account agreement among J&C, Coral, and Wells Fargo, as many businesses do when posting cash as collateral, Coral instructed J&C to wire transfer the $1.4 million to Wells Fargo without a clear understanding of the steps needed to hold the cash as collateral.  The record shows the wire transfer went to a wire transfer clearing account at Wells Fargo, and the money was thereafter transferred to Coral's Loan Account.

It appears J&C agreed to the Note transaction without any structural protections regarding the $1.4 million other than the statement in the Note that the cash collateral had to be held or used for the Debtors' obligations.  Notably, while the Note expressly permits commingling of the $1.4 million provided by J&C, it is silent regarding returning the Side Collateral to J&C.  The idea that the cash would be held as collateral within Coral's accounts – those owned and controlled by Coral – was a mere illusion, since this never happened.

To establish Coral held $1.4 million as collateral during the time periods relevant here – before the Petition Date, through the present day – Coral needed to present evidence it continuously held at least that amount in bank accounts it owned and controlled.  Coral is correct the $1.4 million of cash could be commingled.  However, Coral

is mistaken that the ability to obtain cash it does not hold, when and if needed, is the same as holding cash as collateral.

Coral's evidence and its admissions establish Coral did not hold $1.4 million of cash as collateral at any time. Ms. Steklov testified, and the parties agree, each time J&C wired an installment of money representing the Side Collateral under the Note, it was transferred to Wells Fargo and then directly applied to Coral's Loan Account, increasing Coral's loan availability. The application of the Side Collateral to the Loan Account was a "use" or "application" of the Side Collateral, and, pursuant to the terms of the Note, the only permissible use of the Side Collateral was for payment of the Debtors' obligations, as defined in the Note. ECF No. 2186-24; Exhibit 2099-40; Note §§ 5.3, 7; see also ECF No. 2033, pp. 3-4. This means, because the Side Collateral was never deposited in an account owned and controlled by Coral, Coral did not perfect a security interest in the cash.

Although Wells Fargo later transferred funds drawn from Coral's Loan Account into the Collateral Account, the deposit of $1.4 million into an account owned and controlled by Wells Fargo did not perfect Coral's security interest in the cash either. Once a pool of cash collateral is emptied, it cannot be "re-filled." See ECF No. 2033. But here, Coral never established its security interest in the $1.4 million of cash under N.Y. U.C.C. § 9-203(b)(3)(B) and the cash never became collateral, in part because the "Side Collateral" was immediately used by Coral.

During the present dispute, Coral's argument regarding the cash collateral has evolved. Coral now argues its, "access to cash displaces any obligation by Coral to hold [the $1.4 million of cash collateral]. Any cash will do." ECF No. 1944, p. 5. This argument emerged after Coral's attorneys argued they provided the other parties "Banking Records

showing the $1.4 million Side Collateral in Coral's bank account on May 21, 2019," implying a balance on a particular date would be sufficient evidence of the status of the cash collateral.  ECF No. 1226, p. 4.  Coral argued from late 2021 through the present that, "the relevant inquiry is whether Coral at all times maintained or had access to money in the amount of the Side Collateral."  ECF No. 1422, p. 44.  Because neither Coral nor the Court has identified legal authority supporting the proposition that "access to money" is the same as holding cash as collateral or meets the obligation to "keep the collateral identifiable" imposed by N.Y. U.C.C. § 9-203(b)(3)(B), Coral's argument must be rejected.

Because Coral used the $1.4 million of Side Collateral, Coral must be deemed to have applied it to the Debtors' obligations, including the balance due on the Note, by the Note's own terms.  On that basis alone, even if Coral had standing, Coral's immediate use of J&C's cash upon each transfer from J&C – whether Coral characterized things this way or not – requires disallowance of Coral's claim on the Note.

### b.  _Coral Used the Entirety of the Side Collateral No Later than December 11, 2018_

On this record, even if Coral had standing to enforce the Note and had perfected its interest, notwithstanding its immediate use or application of the $1.4 million of cash upon transfer to the Loan Account, Coral's claim on the Note must still be disallowed because the cash was spent.

As noted, Coral's argument that being able to borrow money on demand is equivalent to holding cash as collateral is without merit.  However, Coral's alleged ability to obtain $1.4 million to repay the Side Collateral[11] is also irrelevant because the law is

---

[11] Coral's argument also conveniently ignores the logical conclusion that, in order to be repaid, the Side Collateral must have been used.

clear that later received funds cannot be used to refill or replenish a deposit of cash being held as collateral. *Gen. Motors Acceptance Corp*, 141 Misc. 2d at 355 ("As funds are paid out, they are first paid out of non-proceeds, and then out of proceeds. As non-proceeds are deposited, they do not replenish any proceeds previously paid out due to insufficiency of non-proceeds funds."); see also *Connecticut General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988) (After commingling, if all the money is withdrawn, the trust fund is treated as lost, even though later deposits are made into the account.); *In re Columbia Gas Sys.*, 997 F.2d 1039, 1063 (3d Cir. 1993) (Once trust money is removed it cannot be replenished by subsequent deposits. Therefore, the lowest intermediate balance in a commingled account represents the only trust funds that remain.); *Old Republic National Title Ins. Co. v. Tyler* (*In re Dameron*), 155 F.3d 718, 724 (4th Cir. 1998) (In no case is the trust permitted to be replenished by deposits made subsequent to the lowest intermediate balance.); *Texas Comptroller of Public Accounts v. Weathers* (*In re Vaughn Motors, Inc.*), Docket No. 00-50358, 2001 U.S. App. LEXIS 30178, at *8 (5th Cir. Jan. 25, 2001) (applying the Lowest Intermediate Balance Test and refusing to permit replenishment of the account).

Coral could therefore be found to have "used" the Side Collateral, in its entirety, on December 11, 2018, when $1.4 million was transferred from the Wells Fargo Collateral Account to the Loan Account, and the only permissible use of the money, pursuant to the Note, was to pay the Debtors' obligations to Coral.

3. *Lowest Intermediate Balance Test: Coral Used the Side Collateral Save for a Remaining $82,181.42 No Later than December 24, 2018*

Even if all of the above were incorrect, it is undisputed and Coral concedes that after commingling the $1.4 million which was to represent the Side Collateral, by

December 24, 2018, Coral possessed and controlled no more than $82,181.42 in fungible cash that could serve as the Side Collateral.  As explained in greater detail in ECF No. 2033, applying the Lowest Intermediate Balance Test, the Court can conclude Coral "used" at least $1,317,818.58 of the Side Collateral as of December 24, 2018.  Once used, those funds could not thereafter be replenished via subsequent deposits, and so Coral must be deemed to have applied $1,317,818.58 to the Debtors' obligations.  The Court could (but need not) conclude Coral is only entitled, under the most lenient interpretation, to $82,181.42 pursuant to the Note.

<u>Allegations of Coral's Bad Faith and the Status of the $1.4 Million of Cash Collateral</u>

One consequence of these illusions has been that the Chapter 7 Trustee, VFI, and J&C believed Mr. Bertie's testimony and Coral's attorneys' statements to the Court.  They believed Coral held $1.4 million in an account – perhaps commingled with other cash – representing the Side Collateral under the Note.  In response, they pursued various claims based on the material facts that Coral was entitled under applicable law to enforce the Note, that Coral had received and continued to hold $1.4 million of cash collateral, and that Coral was not required to apply the $1.4 million of cash collateral to the Debtors' obligations.  Leaving aside whether the marshaling theories, subordination claims, or subrogation claims alleged against Coral might prevail, it is reasonable to conclude that if Coral had accurately disclosed the material facts regarding the cash to be held as collateral at the time of Mr. Bertie's May 2019 deposition, the Trustee, VFI, and J&C would have acted very differently.

The Court has not heard a cogent explanation for why Coral concealed these simple and material facts, equivocated through December 2024 when answering the Court's questions which clearly sought basic information about the status of the cash J&C

delivered to Wells Fargo, or chose to advance the unsupported idea that borrowing cash was the same as holding cash as collateral.  Based upon this record and the evidence adduced during the Evidentiary Hearing, it appears further proceedings regarding Coral's conduct during the litigation and Coral's attorneys' conduct in responding to the Court's direct questions are warranted.  See Fed.R.Bankr.P. 9011(c); 28 U.S.C. § 1927.

## **CONCLUSION**

Coral's claims pursuant to its role as the Debtors' factor before and after the Petition Date will be allowed as described in this decision, resulting in Coral owing the Debtors' bankruptcy estates approximately $818,000 plus interest.  No attorney's fees or costs are awarded to Coral.

Regarding the Note, Coral lacked standing to enforce the Note at any relevant time.  Assuming for the sake of argument that Coral could establish standing, Coral never perfected a security interest in the $1.4 million of cash, never held the cash as collateral, was required to apply the $1.4 million of cash to the Debtors' obligations if Coral no longer held the cash as collateral, and therefore was not owed anything on the Note on the Petition Date.  Coral's claim based on the Note is disallowed.

All other arguments were considered and found to be without merit.

This is a final decision regarding Coral's Proof of Claim 79-3 and amended statement of its claims filed as ECF No. 1940, as well as the parties' various objections to Coral's claims, Coral's cross claims, and the other matters identified below where relief is allowed, disallowed, or objections are sustained or overruled.  Traditional appeal rights apply.  *Ritzen Group, Inc. v. Jackson Masonry, LLC,* 589 U.S. 35 (2020); see Fed.R.Bankr.P. 8002.

**RULING AND DECISION**

Accordingly, it is hereby

**ORDERED**: Coral's Proof of Claim 79-3 is allowed in part and disallowed in part, and ECF Nos. 507, 562, and 1940, as well as the objections to Coral's Proof of Claim 79-3 filed as ECF Nos. 646, 647, 1122, 1125, 1238, are resolved as follows:

(1)    Coral's pre-petition Factoring Agreement claim is disallowed; and

(2)    Coral's post-petition Factoring Agreement claim is allowed as a post-petition secured claim and a Chapter 11 administrative expense claim in the amount of $205,453.01.  No attorney's fees or costs are awarded on this claim because it was not materially disputed; and

(3)    Coral's claim based on the Secured Term Note is disallowed.

And, it is further

**ORDERED:**  On or before December 15, 2025, Coral shall pay the Chapter 7 Trustee $817,912.79, representing Coral's overcollection of accounts receivable in the amount of $1,023,365.80 less the allowed post-petition claim of $205,453.01.  On or before December 15, 2025, Coral shall also pay the Chapter 7 Trustee interest of $474,048.33, for a total payment of principal plus interest equal to $1,291,961.12.  Interest is calculated at a rate of nine (9%) percent per annum, for the time period from May 31, 2019, through the present, pursuant to N.Y. C.P.L.R. 5001.  Interest is calculated through November 10, 2025, with a per diem accruing thereafter at a rate of $200.98.  And, it is further

**ORDERED**: To the extent Coral's statements at the July 29, 2025, hearing can be construed as an oral motion to re-open the evidentiary record, the motion is denied; and it is further,

**ORDERED**: ECF No. 2114 is granted in part to the extent any docket entries specifically identified in ECF No. 2114 were referenced in this decision but not specifically admitted into evidence during the Evidentiary Hearing; and it is further

**ORDERED:** Any proof of claim against one or more of the Debtors' bankruptcy estates arising from the disallowance of Coral's Secured Term Note claim must be filed by December 15, 2025; and it is further

**ORDERED:** The Court will separately enter (partial) Judgments and further Orders, and schedule further proceedings to address the allegations of bad faith in the course of this litigation, to address objections to VFI's proofs of claim, and any other matters which become ripe for decision, including requests for attorney's fees.

Dated this 10th day of November, 2025, at New Haven, Connecticut.



Ann M. Nevins
Chief United States Bankruptcy Judge
District of Connecticut